**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

$85,688.00 IN UNITED STATES
CURRENCY,

        Defendant,


ANDREW C. WILEY,

        Claimant - Appellant.

No. 13-4067
(D.C. No. 2:09-CV-00029-DS)
(D. Utah)

## ORDER AND JUDGMENT[*]

Before **BRISCOE**, Chief Judge, **EBEL** and **PHILLIPS**, Circuit Judges.


At the end of a Utah traffic stop, a state trooper detained Andrew Wiley so that a drug

dog could sniff around Wiley's truck. After the dog alerted, troopers searched Wiley's

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

truck and seized from it $85,668[1] and a small amount of marijuana. Although Wiley was never charged with a federal crime, the government filed a forfeiture complaint against the currency. As part of the forfeiture-in-rem proceeding, Wiley filed a motion to suppress, challenging the reasonableness of his detention preceding the search of his truck. After a hearing, the district court denied the motion to suppress.

On appeal, all panel members agree that the initial stop was justified at its inception. But Judge Phillips and Judge Ebel both vote to reverse the district court's order denying suppression. Judge Phillips reasons that reasonable suspicion of any registration offenses (expired, fake, or stolen license plates or registration tabs) dissipated when the trooper learned or should have learned that the State of Missouri had issued the plate and its registration tab within two weeks of the traffic stop; and that any reasonable suspicion that Wiley's truck was stolen dissipated when Wiley handed the trooper his "original motor vehicle title receipt." Although Judge Phillips agrees with Chief Judge Briscoe that the trooper had reasonable suspicion of illegal drug activity by the end of the stop, Judge Phillips reasons that the government cannot rely on the key facts suggesting illegal drug activity because the trooper learned those facts after Wiley was entitled to be released. Judge Ebel reasons that reasonable suspicion continued up to the point that the trooper returned Wiley's driving documents and told Wiley he was free to leave. But Judge Ebel reasons that the trooper lacked reasonable suspicion of illegal drug activity before continuing to detain Wiley in order to deploy the drug dog. Chief Judge Briscoe dissents,

---

[1] We note a small discrepancy in the dollar figure stated in our caption versus the district court's. Our caption lists the amount alleged in the government's forfeiture complaint.

reasoning that the trooper had reasonable suspicion of a registration-related offense up until he returned Wiley's driving documents and further that by then he had a separate reasonable suspicion of illegal drug activity. Accordingly, because two judges vote to suppress the evidence seized from the truck, we REVERSE the district court's order denying suppression and REMAND for further proceedings.[2]

Entered for the Court
Per Curiam

---

[2] We grant the government's motion to supplement the record on appeal to include a transcript of the traffic stop.

United States v. $85,688.00, No. 13-4067

**EBEL**, J., concurring in the judgment.

This case turns on whether an officer conducting a traffic stop maintained a reasonable suspicion of criminal activity throughout his investigation of a cooperative, yet objecting, citizen. Chief Judge Briscoe believes such justification existed throughout the stop and interrogation here, and she would therefore affirm the district court's denial of Wiley's suppression motion. Dissenting Op. at 1, 4, 9, 18-19.

While Judge Phillips and I agree that the prolonged detention violated Wiley's Fourth Amendment rights, we disagree about <u>when</u> the encounter became unjustified and, thus, unconstitutional. Judge Phillips concludes that Trooper Neff lacked reasonable suspicion to continue to detain Wiley after Trooper Neff should have concluded that Wiley's truck was lawfully registered in Missouri—something Judge Phillips believes should have happened well before Trooper Neff observed any of the factors that the government now contends authorized prolonging the detention for a dog sniff. Judge Phillips would thus reverse without needing to determine whether Trooper Neff's continued investigation gave him reasonable suspicion that Wiley was trafficking drugs. Phillips Op. at 8 n.5. I believe, on the contrary, that Trooper Neff had sufficient cause to detain and question Wiley up to, but not after, the point he returned Wiley's driving documents and told him that he could be on his way. In my opinion, therefore, only the evidence obtained against Wiley from that point on must be suppressed.

Thus, although Judge Phillips and I reach the same conclusion—that the evidence against Wiley must be suppressed—I write separately.

I.

I agree with Chief Judge Briscoe that Trooper Neff possessed reasonable suspicion to detain Wiley in his patrol car for sixteen minutes while he investigated a possible registration violation. We all agree that the "not on file" response to Trooper Neff's registration inquiry justified the initial traffic stop. See United States v. Esquivel-Rios, 725 F.3d 1231, 1235 (10th Cir. 2013). The question, then, is whether the Fourth Amendment affords Trooper Neff the leeway to confirm or deny his registration suspicions as he did. I believe it does.

Although I doubt that a more vigilant inspection of Wiley's license plate and apparently valid tags would have adequately dispelled a reasonable officer's suspicions, because it seems unlikely that further roadside investigation was capable of reconciling the inconclusive information relayed by the computerized records search, we need not resolve that issue in this case because no such inspection occurred here, and the Fourth Amendment did not mandate such an inspection. Judge Phillips concludes otherwise, pointing to the statement in Florida v. Royer, 460 U.S. 491, 500 (1983), that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Phillips Op. at 10. As the Supreme Court has made clear, however, "[t]hat statement . . . was directed at the length of the investigative stop, not at whether the police had a less intrusive means to

- 2 -

verify their suspicions before stopping Royer. <u>The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques</u>." <u>United States v. Sokolow</u>, 490 U.S. 1, 11 (1989) (emphasis added) ("Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to indulge in unrealistic second-guessing." (internal citations omitted)); <u>see also</u> <u>Navarette v. California</u>, 134 S.Ct. 1683, 1691 (2014) (reaffirming the same). I believe that rule adequately protects Trooper Neff's decision to question Wiley rather than to inspect closely his license plate. <u>See</u> <u>United States v. Rodriguez</u>, 739 F.3d 481, 489 (10th Cir. 2013).[1]

In other words, once Trooper Neff received a "not on file" return from the computerized records search, it was reasonable for him to initiate a stop, approach Wiley, and investigate orally his suspicion that Wiley was violating Utah registration laws.[2] It was therefore reasonable for Trooper Neff to request Wiley's driver's license and

---

[1] I agree with Chief Judge Briscoe's distinction of <u>United States v. McSwain</u>, 29 F.3d 558 (10th Cir. 1994) and its progeny. <u>See</u> Dissenting Op. at 4-7. At the risk of oversimplifying, our "tag cases" are essentially mistake of fact cases that stand for the following proposition: when an officer initiates a traffic stop based on a faulty, visual observation, he cannot detain the individual past the point he realizes, or should have realized, that the justification for the stop was illusory from the beginning. That principle does not control here, where the stop was based not on a faulty observation but on an objective incongruity between the computerized records search's "not on file" return and Wiley's apparently valid plate.

[2] Other officers have testified that such an investigation is essentially standard operating procedure. <u>See</u> <u>United States v. Hernandez-Velasco</u>, 2006 WL 2129468, at n. 7 (D. Utah July 28, 2006) ("Trooper Carrubba testified that in his experience, if he received a 'not on file' response to a computer inquiry he would always stop the vehicle to clarify any discrepancies between the computer and the paperwork within the vehicle."); <u>United States v. Lee-Speight</u>, 2010 WL 2653412, at *1 (D. Kan. June 29, 2010) (same).

registration, have dispatch run computer checks on those materials, and issue any citations or warnings as appropriate. See United States v. Kitchell, 653 F.3d 1206, 1217 (10th Cir. 2011). While he waited for dispatch to run the requisite computer checks, moreover, it was likewise reasonable for Trooper Neff to inquire about Wiley's travel plans, see United States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001), arrest record, see United States v. McRae, 81 F.3d 1528, 1536 n. 6 (10th Cir. 1996), recent truck purchase, see United States v. Ludlow, 992 F.2d 260, 265 (10th Cir. 1993), and almost anything else, "whether or not related to the purpose of [the] traffic stop," so long as the questions "d[id] not excessively prolong the stop," Kitchell, 653 F.3d at 1217. And it was perfectly reasonable for Trooper Neff to ask Wiley to sit in the front seat of his patrol car while he investigated all of the above. See United States v. Speal, 166 F.3d 350 (10th Cir. 1998) (unpublished). Finally, and maybe most importantly, it was not unreasonable for Trooper Neff to detain Wiley for a mere sixteen minutes before he completed that registration investigation. See Williams, 271 F.3d at 1271.

In light of these well-settled rules, therefore, I do not believe Trooper Neff's registration investigation violated the Fourth Amendment.

II.

Although there was nothing unreasonable about the way Trooper Neff investigated the possible registration violation, that is not the end of the inquiry because, as even Trooper Neff conceded, it soon became clear that the suspicions justifying the stop had dissipated. See Aplt. App. at 135-36 ("I didn't have a violation. I believed the vehicle

- 4 -

belonged to him and he had the proper paperwork, and I'm not going to write a ticket for nothing."). While that realization did not vitiate the lawfulness of the stop, it did require Trooper Neff to release Wiley at that time unless he had acquired "a new and independent" basis for reasonably suspecting that Wiley was engaged in criminal activity. See United States v. Winder, 557 F.3d 1129, 1135 (10th Cir. 2009); accord United States v. Soto-Cervantes, 138 F.3d 1319, 1322 (10th Cir. 1998) ("Once the concern that justified the initial stop is dispelled, further detention will violate the Fourth Amendment unless the additional detention is supported by a reasonable suspicion of criminal activity."). No one disagrees that Trooper Neff failed to release Wiley, or that Wiley refused to consent to his further detention. As such, the dispositive question is whether Trooper Neff's sixteen-minute registration investigation yielded the additional reasonable suspicion necessary to extend the traffic stop beyond its initial purpose.

The district court held that it did, concluding that the totality of the circumstances led Trooper Neff to reasonably suspect that Wiley was trafficking drugs. According to the district court, Wiley's travel plans and the "lived-in" look of his truck combined with his past marijuana arrest, unemployment status, and nervousness supported an objectively reasonable suspicion to prolong the stop. Although Chief Judge Briscoe disclaims any reliance on many of the factors credited by the district court, she nevertheless concludes that the totality of the circumstances justified the prolonged detention and subsequent canine sniff. I cannot agree.

- 5 -

Before explaining why I diverge from Chief Judge Briscoe, I should stress that we agree that the district court erroneously credited many of the reasonable suspicion factors urged by the government. I agree with Chief Judge Briscoe, for example, that Wiley's possessing a coffee cup and an energy drink contribute nothing to the reasonable suspicion calculus. To that list, I would also add Wiley's hanging shirts, discarded wrappers, and cell phone charger. Although Trooper Neff testified that each of these factors heightened his suspicions, see, e.g., Dist. Ct. at 11 ("Trooper Neff testified that based on his training and experience, the motoring public traveling across the country in pursuit of innocent activities will periodically stop and tidy up their vehicle."), the district court erred in holding that such factors could contribute to a reasonable suspicion of drug trafficking. This court has long recognized that inchoate suspicions and unparticularized hunches "based on indicators so innocent or susceptible to varying interpretation as to be innocuous cannot justify a prolonged traffic stop or vehicle search." See, e.g., United States v. White, 584 F.3d 935, 950 (10th Cir. 2009) (internal quotation marks omitted); accord United States v. Kaguras, 183 F. App'x 783, 789 n. 2 (10th Cir. 2006) (unpublished) ("Reasonable suspicion must be reasonable."). The foregoing factors should have been afforded no weight, either individually or in the aggregate, not because they are associated with innocent but not criminal conduct, but because they have become so ubiquitous in interstate travel that they are simply not probative one way or another. No matter what other factors are present, in other words, I fail to see how the presence of, for example, a cell phone charger makes it more or less likely that an individual is trafficking drugs.

For similar reasons, I agree with Chief Judge Briscoe to afford no weight to Trooper Neff's testimony that his suspicions were also peaked by Wiley's nervousness and recent truck purchase. According to Trooper Neff, the fact that Wiley said he paid $5,000 for his truck was suspicious because Trooper Neff believed it was "brand new" and worth much more than that, testifying that "drug organizations provide newly purchased vehicles for low prices and register those vehicles in the name of the driver." Dist. Ct. at 12. The problem, however, is that Wiley's truck was neither brand new nor worth more than $5,000, and Trooper Neff's subjective beliefs to the contrary were not objectively reasonable in the face of being provided an official title receipt that listed the truck as six years old with more than sixty-seven thousand miles on it. And because reasonable suspicion cannot arise from an officer's unreasonable factual errors, see United States v. Herrera, 444 F.3d 1238, 1246 (10th Cir. 2006), the district court erred in weighing this factor in its totality of the circumstances analysis.

As Chief Judge Briscoe recognizes, the district court also erred in crediting Wiley's alleged nervousness in the reasonable suspicion calculus. Although Trooper Neff asserted that Wiley appeared nervous, his subjective evaluation of Wiley's behavior is not controlling: given the fact that the two had never interacted before, Trooper Neff lacked any basis to evaluate whether Wiley "was acting nervous and excited or whether he was merely acting in his normal manner," United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994) (internal quotation marks omitted). Indeed, because "it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them

or nervously," this court will reject an officer's "naked assertion" of nervousness unless it is accompanied in the record by "specific indicia" verifying that "the defendant's nervousness was extreme." United States v. Simpson, 609 F.3d 1140, 1147-48 (10th Cir. 2010) (emphasis added). That confirmation was not present here: neither Wiley's statement that he did not want any tickets nor his alleged fumbling his phone as he searched for his aunt's number qualifies as extreme nervousness. See United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer."); United States v. Wald, 216 F.3d 1222, 1227 (10th Cir. 2000) ("Wald's fumbling for his vehicle registration suggested nothing more than such innocuous nervousness.").

Once the above factors are removed from the reasonable suspicion calculus—either because they find no support in the record or because they are too innocuous to be probative of anything—the only factors that remain are Wiley's travel plans, arrest record, can of Febreze, and failure to roll down his window completely. For the reasons developed below, I believe that the totality of these factors, along with the inferences drawn therefrom, were insufficient to give an objective officer reasonable suspicion to suspect that Wiley was trafficking drugs.

### i. **Wiley's partially rolled down window and can of Febreze**

Trooper Neff testified that his suspicions were peaked upon approaching Wiley's truck and noticing that Wiley had only partially rolled down his window. Combined with

the fact that Wiley then rebuffed Trooper Neff's request to open Wiley's truck door, Trooper Neff testified that he suspected Wiley was trying to mask the odor of illegal drugs. Wiley's actions, however, amounted to little more than Wiley refusing to consent to a search of his vehicle, and it should go without saying that crediting such a refusal in the reasonable suspicion calculus would violate the Fourth Amendment. After all, as this court has previously recognized, "[i]f refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections. A motorist who consented to a search could be searched; and a motorist who refused consent could be searched, as well." United States v. Santos, 403 F.3d 1120, 1126 (10th Cir. 2005). Thus, because a refusal of consent can play no role in the reasonable suspicion calculus, the district court erred in weighing Wiley's partially rolled down window in its analysis.

Trooper Neff further testified, however, that his suspicion that Wiley was attempting to mask the smell of drugs was heightened upon noticing an aerosol can of Febreze in Wiley's truck, which he asserted was "very common for being used to mask small amounts of marijuana." Aplt. App. at 58. Although considering the Febreze can in the reasonable suspicion analysis is not per se inappropriate, it carries very little weight under the circumstances of this case. As an initial matter, while it is true that "[t]he Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis," United States v. West, 219 F.3d 1171, 1178 (10th Cir. 2000) (emphasis added), there was no testimony here that scent of air freshener was emanating from Wiley's truck, and I am unaware of any case where this court has

held that the mere <u>presence</u> of an air freshener can support reasonable suspicion.[3]  Nor would that seem to be a distinction without a difference: after all, if the inference is that drug traffickers use air fresheners to mask the smell of the drugs they are transporting, then the fact that an officer observes but does not detect the use of an air freshener would seem to <u>counsel against</u> inferring that drugs are present.  Indeed, that would be particularly true in the case of an aerosol air freshener, like Febreze, which only works if activated by its user.  In any event, however, even "[t]he scent of air freshener, standing alone, is inadequate to support reasonable suspicion absent other indicia of criminal activity," <u>Kaguras</u>, 183 F. App'x at 790, and the totality of the circumstances here make it particularly inappropriate to give this factor much weight.  Not only are other indicia of criminal activity lacking, but having Febreze is entirely consistent with Wiley's explanation that he was on a cross-country road trip, especially because, as Trooper Neff testified, Wiley's truck had a "lived-in look" with luggage and wrappers strewn throughout the cabin.

---

[3] <u>See, e.g.</u>, <u>United States v. Beltran-Diaz</u>, 366 F. App'x 950, 953 (10th Cir. 2010) (unpublished) (considering "heavy scent of air freshener"); <u>United States v. Bravo</u>, 306 F. App'x 436, 439 (10th Cir. 2009) (unpublished) (same); <u>United States v. Powell</u>, 277 F. App'x 782, 785 (10th Cir. 2008) (unpublished) (same); <u>United States v. Lyons</u>, 510 F.3d 1225, 1231 (10th Cir. 2007) (same); <u>United States v. Kaguras</u>, 183 F. App'x 783, 790 (10th Cir. 2006) (unpublished) (same); <u>United States v. Garcia-Rodriguez</u>, 127 F. App'x 440, 446 (10th Cir. 2005) (unpublished) (same); <u>United States v. Anderson</u>, 114 F.3d 1059, 1066 (10th Cir. 1997) (same); <u>United States v. Leos-Quijada</u>, 107 F.3d 786, 795 (10th Cir. 1997) (same); <u>United States v. Alvarez</u>, 68 F.3d 1242, 1244 (10th Cir. 1995) (same).

ii. **Wiley's travel plans**

Trooper Neff also testified that his suspicions were heightened upon learning of Wiley's travel plans. Although this court has "credited inconsistent travel plans as a factor contributing to reasonable suspicion when there are lies or inconsistencies in the detainee's description of them," we have rightfully "been reluctant to deem travel plans implausible—and hence a factor supporting reasonable suspicion—where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make." Simpson, 609 F.3d at 1148-49. Because Wiley's travel plans were neither inconsistent nor implausible and, therefore, not suspicious as a matter of law, the district court erred in finding Wiley's travel plans supportive of reasonable suspicion. See Santos, 403 F.3d at 1132 ("Our holding that suspicious travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se.").

Wiley told Trooper Neff that he was driving from Missouri to California to visit friends and family. When pressed for more details, he said he was going to Los Angeles to visit both his friend, Zach, who recently opened a cross-fit gym, and his aunt, Shiloh, who needed help around her house because she was ninety-two years old. Wiley relayed that it was as good a time as any to make the cross-country trip because he had recently been laid off from his job at a bank. When Trooper Neff inquired whether Wiley had taken I-80 all the way from Missouri—presumably attempting to trip Wiley up because I-80 does not travel through Missouri—Wiley responded that he had taken I-70 through

Colorado but had elected to take I-80 the rest of the way to California on his dad's recommendation that "it was beautiful country." Tr. of Stop at 7. Although he conceded that taking I-70 would have saved him almost a day in travel, he noted both that the northern route was more scenic and that he had never taken it before, proclaiming "[i]f you're driving this [far], man, it might as well be worth it." Tr. of Stop at 13.

As Chief Judge Briscoe recognizes, Wiley's account of his travel plans was neither vague nor inconsistent. Without hesitation, he was able to explain where he was coming from, where he was going, and why he was going there; he was able to provide Trooper Neff with the names and numbers of his aunt and friend who he was going to visit,[4] and his recollection of the places that he had stayed and the roads that he had traveled on up to that point were consistent with those plans. Trooper Neff testified that he found it suspicious that Wiley was on I-80 rather than I-70, because I-70 provided a more direct route to his destination; but Wiley's driving on I-80 was actually consistent, not inconsistent, with his claim that he desired to take what he believed was a more scenic route to his destination. Moreover, while taking a less-direct, more-scenic route could be inconsistent with a detainee's claim that he was in a hurry or needed to be somewhere, Wiley's travel plans were entirely consistent with his unemployment, which "permitted him the luxury of time to make such a trip," Wood, 106 F.3d at 947. His

---

[4] Although neither Zach nor Shiloh answered when dispatch attempted to make contact, that did not provide reasonable cause to be suspicious: there was no reason to believe the numbers were not valid, and in the days of mass-telemarketing and caller ID, many of us screen unknown calls, especially those from out of state numbers.

- 12 -

account of his travel plans also cohered with the contents of his truck, as snacks, caffeine, and cell phone chargers are part and parcel of any cross-country road trip.

Since there was nothing suspicious about Wiley's <u>account</u> of his travel plans, reasonable suspicion would have been warranted only if the plans themselves were implausible or suspicious—that is, if Wiley's itinerary was not "merely unusual," but was "sufficiently bizarre" to constitute a factor contributing to reasonable suspicion, <u>see</u> <u>Simpson</u>, 609 F.3d at 1151. While it seems unlikely that Wiley's itinerary was even unusual, his travel plans were decidedly not sufficiently bizarre or implausible to warrant reasonable suspicion. <u>See</u> <u>Wood</u>, 106 F.3d at 947 ("There is nothing criminal about traveling by car to view scenery."). To be sure, Trooper Neff believed that they were— asserting that I-80 is not beautiful, and even if it were, driving on I-80 for its scenery alone is suspicious—but implausibility, like all reasonable suspicion factors, must be judged under an objective standard, not according to whether the individual officer would choose to take the same trip or route if given the chance. And under the totality of the circumstances presented here, there was nothing objectively implausible about Wiley's travel itinerary. Visiting friends and family was reason enough to take the trip; his savings and family assistance made it financially attainable; and his recently being laid off allowed him the flexibility to take the route of his choosing.

### iii. **Wiley's arrest record**

Trooper Neff also testified that his suspicions of drug trafficking activity were heightened after a criminal history check revealed that Wiley had previously been

arrested for marijuana and paraphernalia possession. Although this court has long stated that an individual's criminal record "may cast a suspicious light on other seemingly innocent behavior," see Simpson, 609 F.3d at 1147, we have stressed that "prior criminal involvement alone is insufficient to give rise to the necessary reasonable suspicion to justify shifting the focus of an investigative detention from a traffic stop to a narcotics or weapons investigation." Wood, 106 F.3d at 948. "If the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification at all." United States v. Sandoval, 29 F.3d 537, 543 (10th Cir. 1994). In short, lest we desire to turn individuals with prior arrests, let alone convictions, into "roving targets for warrantless searches," Santos, 403 F.3d at 1132, we give little weight in the reasonable suspicion calculus to criminal history when, as here, other indicia of criminal activity are lacking. What's more, there is also some question whether the criminal history check in this case actually revealed facts that mapped onto the officer's ultimate suspicions: although Trooper Neff testified that he suspected Wiley of drug trafficking, Wiley's criminal history report only revealed arrests—not convictions—for marijuana and paraphernalia possession—not trafficking—dating back more than seven years.[5] Needless to say, the probative value of

---

[5] Perhaps recognizing the disconnect between a nearly decade old marijuana possession charge and full-scale drug trafficking, the government attempts to imbue this factor with more probative force by alleging that Wiley lied about his marijuana charges. Aple B. at 26. But the record does not support that allegation.

When Trooper Neff asked Wiley if he had ever been arrested before, Wiley responded, "A long time ago I had a DUI, seven years ago. And it was just kind of—."

a past conviction—to say nothing of a mere arrest—becomes weaker when the record moves from revealing a past propensity to commit the exact offense suspected, to revealing simply that the detainee has broken the law in the past.

For these reasons, then, Wiley's criminal history could have reasonably contributed very little to Trooper Neff's suspicions of drug trafficking.

\*        \*        \*

In the whole picture of the stop, the negligibly suspicious factors observed by Trooper Neff become even less suspicious: Trooper Neff saw a Febreze can and found an old arrest, but he also, for example, detected no extreme or prolonged nervousness; heard no inconsistent or implausible travel plans; observed no disconnect between those plans and the contents of Wiley's truck; identified no alterations or modifications to the body of

Tr. of Stop at 9. Before he could finish his thought, dispatch interrupted and asked Trooper Neff a question about Wiley's truck, and Trooper Neff responded. Id. After responding to dispatch, Trooper Neff, as he had done many times throughout the interrogation, immediately changed the subject and asked Wiley, "So you bought this truck for 5,000 bucks?" Id. Wiley's arrest record was not discussed again until four minutes later when dispatch informed Trooper Neff that "there was a prior arrest in 2001 for marijuana possession and paraphernalia possession." Id. at 14. Trooper Neff said, "tell me about that," and Wiley responded, "They didn't come out that way because of the probation. I had two years' probation only, and so they erased it. The only thing that should have stuck was the DUI and the paraphernalia." Id. Wiley's arrest record was never discussed further.

Because the record makes clear that Wiley was cutoff while attempting to explain the circumstances surrounding his DUI arrest—which included the fact that he was also found in possession of marijuana and paraphernalia at that time—I am unable to conclude that Wiley lied about his criminal history. After all, it was Trooper Neff who changed the subject away from Wiley's criminal history, and Wiley was under no duty to protest that interruption or to return the interrogation to the subject at a later time. Cf. Kaguras, 183 F. App'x 783 at n. 2 ("We are cautious about endorsing 'catch-22' factors for reasonable suspicion.").

- 15 -

the truck; and neither saw nor smelled any drugs—all indicators which this court has been repeatedly told correlate strongly with drug trafficking.  I do not mean to suggest that reasonable suspicion cannot be found without observing all, or for that matter any, of these factors, but just that their absence cannot be overlooked during our totality of the circumstances analysis.  If the presence of individually innocent factors cannot be omitted from the reasonable suspicion calculus, then the lack of especially incriminating factors should not be excluded either.  Cf. United States v. Lopez, 518 F.3d 790, 798 (10th Cir. 2008) ("[W]e believe that omission of an expected or customary action, equal to actions themselves, can be of use in assessing whether something is amiss and criminal activity may be afoot.").  In the end, then, only one conclusion follows from the totality of the circumstances presented here:  Trooper Neff may have guessed right this time, but that's not the stuff reasonable suspicion is made of.

I respectfully concur in reversing the district court's denial of Wiley's Motion to Suppress.  I would reverse and remand for further proceedings consistent with this opinion.

13-4067, *United States v. $85,688.00*

**PHILLIPS**, J., concurring in the judgment.

On September 15, 2008, Trooper Chamberlin Neff parked his patrol car in the median on Interstate 80 near Salt Lake City to monitor traffic. He had recently joined the patrol's drug-interdiction team and had a drug dog with him. The trooper saw Wiley's 2002 Toyota Tundra truck drive past him, and he ran its Missouri license-plate number to check its registration.

While patrolling roadways, the trooper often accessed his computer database to check the registration of automobiles with non-Utah license plates. He testified that the database usually returned a name and address for the registered owner. He said that he had previously received returns identifying registered owners from Missouri and other states. He believed that his computer was linked to Missouri's department of motor vehicles.

But this time, as sometimes happened, a search of the computer database didn't reveal whether the truck was registered or unregistered. Instead, it identified the plate as "not on file." Apparently, after dispatch got the same return of "not on file," the trooper stopped Wiley's truck to investigate its registration.[1]

---

[1] Wiley didn't present evidence in the district court undermining the reliability of the database.

Upon stopping Wiley, the trooper made a beeline for the truck's passenger door.[2] On his way, he didn't slow down to look at the plate but appeared to glance at it on his way past. As shown by a photo taken at the stop, the light-colored Missouri license plate looked brand new—it was shiny, clean, unbent, and unscratched—and it bore a permanent mark of "SEP" (for September) as well as a conspicuous yellow tab numbered "09" (for year 2009) in the middle of the plate. The tab was a registration sticker issued annually after payment of fees. Nothing about the plate or tab suggested any alteration or tampering. The trooper testified that he didn't even look at the registration tab to see the year printed on it or to see whether it was a registration for the truck.[3]

After Wiley rolled down the passenger window three or four inches, the trooper asked through the crack if he could open the passenger door. Wiley said no. The trooper asked Wiley if he had his driver's license and was told yes. The trooper then asked where Wiley was going and why. He also asked whether Wiley had been on the road long. Finally, he said, "Tell you what. Grab your license, your registration and come on back to my car, ok?" Government Ex. 19 at 1:53–55. As he passed the back of the truck, the trooper again appeared to glance at the plate while walking by it, but he didn't bend or move closer to examine it. He stood at the rear of the driver's side of the truck staring

---

[2] We now order that the DVDs of the stop stipulated for filing by the parties on January 2, 2014, be filed as a part of this case file.

[3] From the photo of the plate, we can see but can't discern other small printed letters or numbers on the registration tab. Wiley didn't develop the record on what the printed characters are or what they mean. Accordingly, I can't tell whether the trooper could have verified that the truck was registered to Wiley with this information.

forward and awaited Wiley. Plainly, nothing about the plate or tab sparked the trooper's interest.

Wiley took a few moments to collect his documents and then accompanied the trooper to the patrol car. Once inside, the trooper told Wiley that he'd stopped him because his registration didn't return on file. Wiley responded, "Oh, that's no problem. Here. I just bought it." *Id.* at 2:46–50. He provided the trooper with his "original motor vehicle title receipt" for the truck, which the State of Missouri had issued to him just seven days before. He also handed the trooper his driver's license and his insurance card for a different automobile (which he said also covered the truck). The trooper then asked more questions about the people Wiley planned to visit in Los Angeles. During this questioning, the trooper interjected, "Are you nervous?" *Id.* at 3:20–21. After this, he relayed to dispatch Wiley's driver's license number and VIN and asked dispatch for Wiley's criminal history.

As the trooper awaited results from dispatch, he continued to question Wiley about his trip, his preferences in roadside scenery, his work, his finances, his criminal history, his truck purchase, and his aunt and friend in Los Angeles. About seven minutes later, the dispatcher reported that she was "still not able to get anything to come back, even with the VIN." *Id.* at 11:23–27. She said that the driver's license was valid and reported Wiley's criminal history as a "prior arrest in 2001 for marijuana possession and paraphernalia possession." *Id*. at 11:50–12:15.

Although dispatch had by then reported back on all sought information, the trooper still kept Wiley in the patrol car while he had the dispatcher call Wiley's friend

- 3 -

and aunt. While dispatch made the calls, the trooper quizzed Wiley about his marijuana conviction, whether he had recently used marijuana, and his recent truck purchase. After trying to reach the aunt and friend, the dispatcher reported back that she was "getting a message that it's a wireless, uh, Verizon wireless cell and that the customer isn't available right now." *Id.* at 13:38–46, 14:45–53. Only after this did the trooper return Wiley's driver's license and title receipt.[4] Seconds later, the trooper reclaimed Wiley's title receipt. With it in hand, he went to the truck and confirmed that the VIN on the title receipt matched the VIN visible on the truck's dashboard. Having done that, he then opened the driver's door, crouched down beside it, and confirmed (unsurprisingly) that the VIN etched on the inside door frame matched the others.[5] After that, the trooper for a second time returned the title receipt to Wiley, this time telling him to travel safely.

After Wiley had left the patrol car and was walking back to the truck, the trooper called out to him, requesting permission to ask additional questions. Wiley declined. The trooper told him he'd be a little bit longer, saying he believed there was criminal activity.

---

[4] During the stop, the trooper mistakenly referred to the receipt of title as the registration. With Wiley interjecting at points, the trooper said: "Ok. Here's your registration back, and your insurance card back, uh, your driver's license back. I mean, I pretty much, I just want to make sure it's, that it's not stolen. Ok, can I see that real fast, your registration one more time? I'm going to go up and look at the car, at the VIN number of the car, and I'll be right back, ok?" Government's Ex. 19 at 14:56–15:23. The trooper testified that he'd taken the title receipt to the truck to verify its VIN against that etched on the truck.

[5] Upon first encountering Wiley at the passenger door window, lowered slightly, the trooper saw among other things a Febreze air freshener can in the truck. He believed that this potentially indicated criminal conduct because air fresheners can mask the odor of drugs. He saw the Febreze can again when he looked through the windshield while confirming that the VIN on the dashboard matched the VIN on the title receipt.

After asking Wiley a series of questions, the trooper asked for consent to search the car, which Wiley refused. He then asked for consent to run the drug dog around the truck, to which Wiley responded, "No, sir, it's not all right. I'd like to get going." *Id.* at 17:18–22. The trooper replied that it was "definitely all right," adding that he had sufficient suspicion to detain him. *Id.* at 17:22–28. After the dog alerted, the trooper searched the truck and found a large sum of cash and a small amount of marijuana.

The government filed a forfeiture action against the cash found during the stop. Wiley claimed ownership of the money and moved to suppress all evidence obtained from the search. The district court denied Wiley's suppression motion, finding that the "not on file" return justified the stop for a possible registration violation. Further, the court found that the trooper had reasonable suspicion of drug activity to deploy the drug dog and that the dog's alert gave probable cause to search the truck. Wiley appeals the denial of his motion to suppress.

## DISCUSSION

### 1. Reasonable-Suspicion Principles

"When reviewing a denial of a motion to suppress, this Court accepts the district court's factual findings, unless they are clearly erroneous, and views the evidence in the light most favorable to the government." *United States v. Trestyn*, 646 F.3d 732, 741 (10th Cir. 2011). "[C]redibility of the witnesses and the weight to be given the evidence together with the inferences, deductions and conclusions to be drawn from the evidence, are to be determined by the trial judge." *United States v. McSwain*, 29 F.3d 558, 561 (10th

Cir. 1994). "While the existence of reasonable suspicion is a factual determination, the ultimate determination of the reasonableness of a search and seizure under the Fourth Amendment is a question of law reviewed de novo." *Trestyn*, 646 F.3d at 741.

"[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Under *Terry v. Ohio*, 392 U.S. 1 (1968), "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Royer*, 460 U.S. 491, 498 (1983). "A routine traffic stop . . . is more analogous to an investigative detention than a custodial arrest." *Trestyn*, 646 F.3d at 742. When analyzing a traffic stop under *Terry*, we ask two questions: (1) Was the officer's stop justified at its inception? And (2) was it reasonably related in scope to the circumstances that justified the interference in the first place? *Id.*

To justify a traffic stop at its inception, an officer must have reasonable suspicion of criminal activity—"a 'particularized and objective' basis for thinking unlawful activity is afoot." *United States. v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "The Fourth Amendment requires some minimal level of objective justification for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* But it requires "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011). In

- 6 -

evaluating the validity of a stop based on reasonable suspicion, the Supreme Court directs that we consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The government bears "the burden before the district court of establishing by a preponderance of the evidence that reasonable suspicion supported the officer's stop of [a] vehicle." *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012).

When an officer's reasonable suspicion is dispelled before the officer asks for driving documents and questions the driver, the officer's requests for information exceed the limits of a lawful investigative detention and violate the Fourth Amendment. *McSwain*, 29 F.3d at 561–62. "[R]easonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout." *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998). In such circumstances, the officer may explain to drivers "the reason for the initial detention and then allow them to continue on their way without asking them to produce their driver's license and registration." *McSwain*, 29 F.3d at 562. The officer may not continue to question the driver. *Id.* at 561–62.

In an ordinary traffic stop, the officer has witnessed a traffic violation and thus has probable cause (not just reasonable suspicion) to detain the driver. In that instance, as part of the traffic stop, the officer may ask questions about travel plans, "request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Williams*, 271 F.3d 1262, 1267–68 (10th Cir. 2001) (speeding violation). But when, as

- 7 -

here, an officer merely suspects a traffic violation, he may not continue to detain the driver for these purposes after reasonable suspicion has dissipated.

## 2. Reasonable Suspicion in This Case

A good place to begin our analysis is by asking what the trooper's "not on file" return meant and didn't mean. It didn't mean that Wiley had committed a crime—unlike, say, a trooper's radar screen showing a speed limit violation. Instead, it meant that for some reason—criminal or innocent—the database didn't include Wiley's license plate. Innocent reasons would include that Wiley had registered his truck so recently that Missouri had not yet entered it into its database, or that the trooper's computer didn't have access to Missouri's database showing Wiley's valid registration. Criminal reasons would include that Wiley had a fake or forged plate.

The parties and the district court focused on whether the trooper had reasonable suspicion of a crime at two discrete times—when he initiated the traffic stop, and when he detained Wiley to search the truck. This approach failed to appreciate that the reasonable suspicion requirement continues throughout the *entire* stop. It is not enough to have reasonable suspicion at the beginning and then at the end. *See United States v. De La Cruz*, 703 F.3d 1193, 1196–98 (10th Cir. 2013). As explained below, I believe that the initial reasonable suspicion of a registration offense dissipated when the trooper saw or should have seen the truck's recently issued, current license plate and registration tab, and reasonable suspicion that the truck was stolen dissipated when Wiley provided his "original motor vehicle title receipt" showing that he owned the truck. These events

occurred long before the trooper built reasonable suspicion of drug-related activity.[6] When reasonable suspicion of these possible offenses dissipated, the trooper was obligated to release Wiley. When the trooper learned (or should have learned) that the facts no longer gave reasonable suspicion of these possible offenses, the once-valid stop needed to end. Without reasonable suspicion of a crime, nothing justified further prolonging the stop. Thus, the trooper had no right to continue to question Wiley in the patrol car after viewing both his recently registered license plate and registration tab and his "original motor vehicle title receipt." And the trooper himself acknowledged that he had no reasonable suspicion of drug-related activity when he first sat Wiley in the patrol car.

I agree with the government that the trooper had reasonable suspicion to stop Wiley upon learning that the truck's license plate was "not on file." That gave reasonable suspicion that the truck may not be validly registered. *See Esquivel-Rios*, 725 F.3d at 1235 ("This court and others have regularly upheld traffic stops based on information that the defendant's vehicle's registration failed to appear in a law enforcement database . . . ."); *cf. United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007) (finding reasonable suspicion when "the state database maintained for the purpose of recording vehicle insurance information contained no information suggesting that the owner of the Explorer had insured it").

---

[6] Had the trooper maintained reasonable suspicion of a crime throughout the stop until returning Wiley's driving documents and allowing him to leave, I would agree with Chief Judge Briscoe for the reasons given in her dissent that the trooper had learned enough by then to have reasonable suspicion of illegal drug activity.

But upon stopping Wiley for this *possible* registration violation, the trooper needed to investigate why the database had reported the plate as "not on file." Without unnecessary delay, the trooper needed to determine whether this "not on file" status arose from innocent or criminal acts. For the trooper to investigate the suspected crimes "without unreasonable delay," I can't see how he could ignore the very things that could dispel his reasonable suspicion—the newly issued, current license plate and registration tab together with Wiley's "official motor vehicle title receipt." *See Royer*, 460 U.S. at 500 ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.").[7] I believe that had he done so he would have seen that he no longer had reasonable suspicion of a registration violation. Once he saw that, the trooper could only advise Wiley why he'd been stopped and allow him to proceed on his way.

Although none of our "display of registration" cases involved searches for registrations on computer databases, they still guide us about an officer's need to investigate the suspected violation to keep an initial reasonable suspicion valid. *See Trestyn*, 646 F.3d at 743 ("Once [the trooper] approached the minivan on foot, he reasonably could have observed the registration number on the minivan's license plate.");

---

[7] I agree with Judge Ebel that this *Royer* quotation is directed at the need to minimize the length of the stop. Ebel Concurrence at 2–3. I think that to *timely* investigate the suspected offenses the trooper needed to examine—sooner rather than later—the key evidence that could dispel reasonable suspicion of the suspected crimes. In the context of this case, the trooper needed to look at the license plate, its registration tab, and the "official motor vehicle title receipt." I don't contend that the trooper needed to examine the license plate and registration tab before making the stop (as opposed to after the stop had begun). *Id.*

*United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir. 2006) ("Once [the trooper] was able to read the Colorado tag and deem it unremarkable, any suspicion that Defendant had violated [Kansas law] dissipated . . . ."); *McSwain*, 29 F.3d at 561 ("[The trooper] stopped Mr. McSwain for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker. Once [the trooper] approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied.").[8]

Even though it was obvious that Missouri had issued Wiley's license plate and registration tab no earlier than September 1, 2008 (a mere two weeks before the stop), and even though Wiley immediately explained the "not on file" report by providing his "original motor vehicle title receipt" showing that he had bought the truck a week before the stop, the government contends that the trooper always had reasonable suspicion that the truck wasn't legally registered and might be stolen. In support, it points to the trooper's testimony that the "not on file" status raised a "laundry list" of possible criminal acts. In fact, the trooper's list was a short one, with just two stated possibilities—that the license plate could be from the truck's previous owner, or that the truck could be stolen. Elsewhere, while explaining why he had not looked at the "registration number on the license plate," the trooper said, "You know, my experience has been with license plates, those stickers are easily torn off and put on other vehicles*."* Appellant's App. at 154–55. I

---

[8] I agree that these cases are not dispositive because none of them had the added feature of a "not on file" return. Their relevance is just as stated—they stand in part for the proposition that when troopers make stops based on suspected registration-related violations they can't stretch out their stops by ignoring evidence of valid registration.

- 11 -

will treat this as raising a third criminal possibility—that Wiley may have removed a registration tab from someone else's Missouri plate and attached it to his own. I am unpersuaded that the government met its burden to show that any of these bases provided reasonable suspicion from the beginning of the stop until the dog's sniff of the outside of Wiley's truck. I note that while the trooper concluded that these suspected violations corresponded to a "not on file" return, he never explained *how* they did so.[9]

Before addressing the three offenses for which the government claims the trooper had reasonable suspicion throughout the entire stop, I pause to note two possible offenses the government doesn't rely upon.

First, the government doesn't contend that the trooper had reasonable suspicion that the plate or registration tab were forgeries. This is understandable after viewing the video of the stop—the trooper exhibited no concern that the plate or tab might be forgeries. While a "no return" from a computer database might well give reasonable suspicion of a forged temporary tag, *see Esquivel-Rios*, 725 F.3d at 1234–35, the trooper's own conduct here shows that it didn't give him reasonable suspicion that Wiley's metal plate and registration tab were forged.

Second, the government doesn't contend that the trooper had reasonable suspicion that the plate may have expired. The 2009 registration tab was affixed to the plate. And,

---

[9] I note that the district court never found that the trooper had reasonable suspicion of a stolen truck or of illegally borrowed or stolen plates. Instead, the district court generally concluded "that the stop of Mr. Wiley was justified at its inception and finds that the traffic stop was valid and legal based on reasonable suspicion of a motor vehicle violation." *United States v. $85,688.00*, No. 2:09-CV-00029-DS, 2010 WL 1257634, at *3 (D. Utah Mar. 25, 2010).

- 12 -

in Missouri, "[a] tab or set of tabs issued by the director of revenue when attached to a vehicle in the prescribed manner shall be prima facie evidence that the registration fee for such vehicle has been paid." Mo. Rev. Stat. § 301.130(6)(3). The Utah statute that the trooper was enforcing exempted from any registration requirement any "vehicle registered in another state and owned by a nonresident of the state." Utah Code Ann. § 41-1a-202(2)(a). I now turn to the three offenses the government contends justified the trooper's prolonged investigation. The government argues that these possible violations gave the trooper reasonable suspicion to continue the stop until the trooper returned all of Wiley's documents and released him.

First, the government contends that the trooper had reasonable suspicion that Wiley was using the plate of the truck's previous owner without reregistering it. Even had Wiley been driving a truck still carrying his seller's plate and registration, I see nothing in the record showing that a computer database search would have returned "not on file" rather than returning the seller's name. And even had Wiley's seller canceled his registration and unlawfully left the plate with Wiley, I see nothing in the record showing that a computer database search would have returned "not on file" rather than "unregistered."

But even if the circumstances gave reasonable suspicion of a registration crime, that suspicion would quickly have dissipated. Even glancing at the Missouri plate on his way by, the trooper would have seen its new condition—shiny, clean, unbent, and unscratched. Had he looked more carefully (actually investigated the crimes he reasonably suspected), he would have seen that the plate bore a permanent mark of

- 13 -

"SEP" (for September) as well as a conspicuous yellow registration tab numbered "09" (for year 2009).[10] He wasn't free to ignore this significant information.

Objectively, the trooper should have known that the Missouri plate was issued in September ("SEP" on the plate) and expired a year later in September 2009. Because the license plate and tag had just been issued (which may have contributed to the trooper's confusion that it was a new truck), it was unsurprising that the plate was shiny new and that the 2009 registration tab showed no portion of an earlier registration tab underneath it.

Because the plate and tag were no more than two weeks old, it made little sense that Wiley might have been driving on the previous owner's plates and registration. That could occur only in the highly unlikely circumstance where the previous owner had paid to register the truck for a year and then within hours or days sold it to Wiley. *See United States v. Stephenson*, 452 F.3d 1173, 1176 (10th Cir. 2006) (in measuring reasonable suspicion we evaluate an officer's conduct "in light of common sense and ordinary human experience"). Moreover, suspicion of this crime would leave unexplained why the computer database didn't still have the plate registered under the previous owner's name. What does make sense is that newly issued registrations take some time to be entered into motor vehicle databases. The trooper himself brought this up as a reasonable explanation.

---

[10] Because of the small size of the numbers, the trooper understandably didn't see the "09" sticker when he called in the larger numbers on the license plate. But with the truck stationary before him, the trooper could not miss the registration tab or ignore its significance.

Reading broadly a single sentence in the government's brief, I think that the government might be suggesting that the trooper had a right to detain Wiley to run his VIN in a further effort to track the registration. Specifically, it said that "[e]ven after inputting the truck's VIN through its computer system, dispatch could not find a registration." Appellee's Br. 5. If, by this, the government means that the trooper had a right to extend the stop for this additional database search, I must disagree for all the reasons above—by then reasonable suspicion of a registration violation had dissipated.

In addition, I wonder how the VIN search even supported the trooper's investigation about the validity of the truck's plate and registration tab. First, the government offered no testimony that VIN searches turn up more complete information than do license-plate searches. And, second, even if this VIN search had showed the plate "unregistered," that would hardly have given probable cause to issue a citation for a registration offense when the truck bore a valid Missouri plate and active registration tab. Absent probable cause of a criminal violation, the trooper would have been left in the same position as he was with the "not on file" return—lacking any basis to hold or cite Wiley and needing to release him.

Second, the government contends that the "not on file" report gave the trooper reasonable suspicion that the truck might be stolen. The problem here is that the government has not explained why a plate's "not on file" status would correspond to an automobile's being stolen. When an automobile is stolen, its plate surely remains of record. Officers have a vital interest in knowing what automobiles are stolen before approaching them. The government has failed to show that stolen automobiles would be

- 15 -

more apt to return "not on file" than to return "registered" or "unregistered." I see nothing suggesting that stealing a car, or even a plate,[11] would erase its previous database entry. Moreover, Wiley provided the trooper an "original motor vehicle title receipt" showing that he owned the truck. Nowhere did the trooper ever suggest that he thought this document was anything but legitimate. In fact, the trooper testified otherwise, saying "I didn't have a violation. I believed the vehicle belonged to him and he had the proper paperwork, and I'm not going to write a ticket for nothing." Appellant's App. at 140. Along the same lines, the district court found that the title receipt "showed that [Wiley] had recently purchased the vehicle for $5,000." *United States v. $85,688.00*, No. 2:09-CV-00029-DS, 2010 WL 1257634, at *1 (D. Utah Mar. 25, 2010).

Third, although I am unsure whether the government asserts this as a basis on appeal, I address the trooper's testimony that registration "stickers are easily torn off and put on other vehicles." Appellant's App. at 155. I read this as the trooper's saying that he might have had reasonable suspicion that Wiley removed the "09" registration tab from someone else's plate and put it on his own. I'm unpersuaded. First, the trooper's lack of interest in the registration tab at the roadside strongly suggests that he didn't think that anyone had altered or tampered with the tab. Second, the photo of the plate shows that the tab was in an undamaged, pristine condition. And, third, as earlier explained, the plate was newly issued two weeks before the stop, so Missouri would have issued the plate

---

[11] I see nothing in the record supporting a conclusion that a stolen plate would yield a "not on file" return. For the same officer-safety reasons explained above, the plate would likely show as stolen, and, if not, would return registered to a different automobile—a tipoff that the automobile itself was stolen. Nothing like that happened here.

- 16 -

with the 2009 tab on it. Accordingly, Wiley would have had no reason to scavenge for a tab to steal and stick to his newly issued plate.

In making these conclusions, I simply apply our rule that a stop must end when reasonable suspicion dissipates. Here, the trooper no longer had reasonable suspicion of a registration violation after seeing the current license plate and registration tab, and he no longer had any reasonable suspicion that the truck was stolen after receiving the "original motor vehicle title receipt" showing that Wiley owned the truck. Any vestige of suspicion after that wasn't reasonable suspicion, but instead conceivable suspicion—otherwise best characterized as insufficient suspicion.

### 3.    What Issues Are Properly Before Us For Decision

The dissent says that I am reversing the district court's judgment on "an issue never presented by Wiley to, nor resolved by, the district court: whether Trooper Neff's suspicion of a temporary violation should have dissipated after Wiley, while sitting in Trooper Neff's patrol vehicle, provided Neff with 'the original motor vehicle receipt' for Wiley's truck." Dissent at 7. It goes on to say that I have "inject[ed a] new issue[] into the case at this late juncture." *Id.* at 8. As I understand it, the "new issue" is what effect Wiley's presenting the trooper with the "original motor vehicle title receipt" had when considered under our rule that reasonable suspicion must exist throughout the entire stop.

By considering the title receipt, I do no more than Wiley did below. In his memorandum supporting his motion to suppress, Wiley stated that he had "produced a title for the vehicle that showed that [he] had recently purchased the vehicle for $5,000."

- 17 -

Memorandum of Law in Support of Motion to Suppress Evidence at 2, *$85,688.00*, 2010 WL 1257634 (No. 2:09-CV-00029-DS, ECF No. 30). Wiley reasserted this point at the suppression hearing. There he vigorously cross-examined the trooper about the title receipt and how it showed that he owned the truck—contesting the new argument that the trooper had reasonable suspicion that the truck was stolen.[12] *See* Appellant's App. at 134–36, 154. If Wiley wasn't raising the importance of the title receipt as part of his challenge to reasonable suspicion, I don't know what else he was doing.

I agree that Wiley could have more specifically argued this point below and on appeal. In response to the dissent's criticism for considering the effect of the title receipt on appeal, I can only point to Wiley's issue statement where, he says, in the district court he had "contended that his Fourth Amendment rights were violated by the officer who stopped his vehicle, detained him without consent, and searched his vehicle." Appellant's Br. at 2. While "violation of Fourth Amendment rights" is indeed a broad claim, I do see that Wiley later contended that his "papers satisfied [the trooper] that the vehicle was not stolen and that there was no violation for which [the trooper] could issue any ticket." *Id.* at 8 n.11. Everything considered, I feel the issue of the title receipt was raised sufficiently to fairly consider it on appeal.

---

[12] I see nothing in the government's memorandum filed before the suppression hearing arguing that the trooper had reasonable suspicion of a stolen truck. Instead, I see the government acknowledging that "[t]he title showed that claimant had recently purchased the truck for $5,000." Memorandum of Plaintiff in Opposition to Claimant's Motion to Suppress Evidence at 2, *$85,688.00*, 2010 WL 1257634 (No. 2:09-CV-00029-DS, ECF No. 31).

I can't agree with the dissent that Wiley's allegedly failing to raise the title receipt issue sufficiently in the district court has prejudiced the government by inducing it not to broaden its litigation strategy there. Dissent at 8. As seen by its memorandum in the district court, the government acknowledged that the title receipt showed Wiley owned the truck: "[Wiley] did not have a vehicle registration for the truck, but instead handed Trooper Neff the vehicle title to the truck. The title showed that [Wiley] had recently purchased the truck for $5,000." *See* Memorandum of Plaintiff in Opposition to Claimant's Motion to Suppress Evidence at 2, *$85,688.00*, 2010 WL 1257634 (No. 2:09-CV-00029-DS, ECF No. 31). The district court found that the title receipt "showed that [Wiley] had recently purchased the vehicle for $5,000." *$85,688.00*, 2010 WL 1257634, at *1. Neither erred. The title receipt showed what it showed.

In view of this, I can't see any prejudice. The trooper himself testified that the title receipt had led him to believe that Wiley was the true owner of the truck. Admittedly, the trooper may have later backpeddled some from this testimony. While acknowledging that he didn't believe the truck was stolen, the trooper said that he still checked the VIN number on the title receipt against the VIN etched into the truck. The dissent characterizes this as the trooper's attempting "to resolve his concerns regarding whether the vehicle was stolen." Dissent at 9. In rejecting this, I consider three things. First, the trooper's comparing the VIN numbers came as an afterthought—in fact, he had to reobtain the title receipt from Wiley after almost sending him on his way. Second, checking the VINs on the truck had an incidental benefit—the trooper, who suspected illegal drug activity, was then able to look into the truck's windows and open the driver's

door. Already concerned about the air freshener being used to mask the odor of drugs, the trooper then could do his own sniff after he'd opened the door.

I can't stretch it enough to treat the last-second VIN comparison as showing reasonable suspicion of a stolen truck. The trooper, wisely, didn't suggest that Wiley may have forged his title receipt and used a different VIN than etched on the truck (keeping in mind that the trooper testified the title receipt appeared to be an official document from the State of Missouri). Nor did he seek to stretch it even further by suggesting that while the title receipt appeared valid Wiley may have stolen a truck made the same year, with the same make, model, and color as the one listed on the title receipt. At some point, reasonable suspicion loses its reasonableness. Third, if the trooper reasonably suspected that the truck may be stolen, I can't see why he would wait so long before checking to see if the VINs matched. Rather than promptly doing that, he instead prolonged the stop to question Wiley in the patrol car while building a separate reasonable suspicion of illegal drug activity.

No. 13-4067, United States v. $85,688.00

**BRISCOE**, Chief Judge, dissenting.

Focusing on the issues actually raised in this proceeding by Wiley, and adhering to the deferential standards of review that we are bound to apply in a case like this, I conclude that the district court properly denied Wiley's motion to suppress. Consequently, I dissent from the majority's decision to reverse and remand.

I

Because they are critical to the resolution of this appeal, I begin by outlining the procedural history of this case and the standard of review we must apply to the district court's decision.

*A. Procedural history*

Approximately four months after the stop and search of Wiley's vehicle, the government filed a verified complaint for forfeiture in rem pursuant to 21 U.S.C. § 881(a). The defendant property was the $85,688.00 in United States currency that was seized from Wiley's vehicle. The government's complaint alleged that "the Defendant property [wa]s subject to forfeiture . . . because it was used to commit, facilitate, was involved in or was proceeds of the commission of violations of 21 U.S.C. §§ 841(a)(1) and 844(a)." Dist. Ct. Docket No. 1 (Complaint) at 2.

Wiley responded by filing a claim for interest in the defendant property and an answer to the government's complaint. He in turn moved to suppress "all evidence obtained as a result of the traffic stop of his vehicle." Dist. Ct. Docket No. 29 at 2. In his memorandum in support of his motion to suppress, Wiley conceded that

> Trooper Neff may have initially complied with the <u>Terry</u> standards as interpreted by the Tenth Circuit: after running a check on [Wiley's] vehicle and his documents, Neff apparently did not issue a warning citation, returned [Wiley's] paperwork and told him to "[h]ave a nice day."

Dist. Ct. Docket No. 30 at 9. But, Wiley argued, Trooper Neff "at this point and consistent with his own words, should have permitted [Wiley] to proceed on his way and have a nice day without further delay for additional questioning." <u>Id.</u> at 9-10. In other words, Wiley argued, Trooper "Neff needed to, but did not, have an objective and reasonable factual basis to justify any further detention or further investigation." <u>Id.</u> at 10.

After conducting an evidentiary hearing during which the government presented testimony from Trooper Neff, the district court denied Wiley's motion to suppress. In doing so, the district court concluded that, "under the totality of the circumstances, . . . Trooper Neff had an objectively reasonable suspicion," at the time he returned Wiley's documents and told him he was free to go, that "Wiley was involved in criminal drug trafficking activity." App. at 26. And "[t]hat suspicion," the district court concluded, "warranted . . . Wiley's further detention beyond the investigation of the traffic stop." <u>Id.</u> at 30.

On May 19, 2011, Wiley moved the district court to reconsider its ruling on his motion to suppress. Citing this court's then-recently-issued decision in <u>United States v. Trestyn</u>, 646 F.3d 732 (10th Cir. 2011), Wiley argued for the first time "that the purpose of the traffic stop premised on suspicion of a registration violation was satisfied when . . .

2

Trooper Neff approached . . . Wiley's vehicle on foot and reasonably could have observed that the registration tag displayed a currently registered out of state vehicle." Dist. Ct. Docket No. 77 at 2. On July 20, 2011, the district court issued a memorandum decision and order denying Wiley's motion to reconsider. The district court concluded that Wiley's "reliance on" Trestyn was "misplaced in that Trestyn [wa]s easily distinguishable from" Wiley's case. App. at 32.

On March 27, 2013, the government and Wiley filed a joint motion for final judgment and order of forfeiture. The motion specifically asked the district court "to issue an unopposed order . . . forfeiting defendant . . . currency . . . to the United States, with claimant [Wiley] reserving his right to appeal the Court's denial of his motion to suppress evidence." Dist. Ct. Docket No. 108 at 1. The district court granted the parties' motion and entered a final judgment and order of forfeiture that same day. App. at 35-38.

Wiley filed a notice of appeal on April 29, 2013.

*B. Standard of review*

"When reviewing a denial of a motion to suppress, this Court accepts the district court's factual findings, unless they are clearly erroneous, and views the evidence in the light most favorable to the government." United States v. Trestyn, 646 F.3d 732, 741 (10th Cir. 2011). "While the existence of reasonable suspicion is a factual determination, the ultimate determination of the reasonableness of a search and seizure under the Fourth Amendment is a question of law reviewed de novo." Id.

3

II

I now turn to address the three issues raised on appeal by Wiley, as well as a new issue raised and resolved by Judge Phillips in his concurrence.

*A.  Did Trooper Neff have a valid basis for the initial stop?*

Wiley argues for the first time in his appellate reply brief that our recent decision in United States v. Esquivel-Rios, 725 F.3d 1231 (10th Cir. 2013) "shows that . . . the initial stop [in this case] was illegal because Neff was not entitled to rely solely on an unreliable database."  Aplt. Reply Br. at 23 (capitalization altered).  I summarily reject this argument.  To begin with, we generally do not consider arguments raised for the first time in a reply brief.  E.g., Mays v. Colvin, 739 F.3d 569, 576 n.3 (10th Cir. 2014).  And, even if we were to consider the argument, nothing in the record calls into question the reliability of the database used by Trooper Neff or the dispatcher.  As a result, Wiley's case is clearly distinguishable from Esquivel-Rios.

*B.  Should Trooper Neff's suspicion of a registration violation have dissipated when he walked past Wiley's license plate?*

Wiley argues, as he did in asking the district court to reconsider its ruling on his motion to suppress, that "whatever objective suspicion of a registration violation developed by [Trooper] Neff [should have] dissipated when he walked past Wiley's license plate which clearly displayed a valid registration sticker, requiring Neff to allow Wiley to be on his way."  Aplt. Br. at 14.  In support, Wiley again points to our decision in Trestyn.

4

Trestyn and the two cases upon which it was based, United States v. McSwain, 29 F.3d 558 (10th Cir. 1994), and United States v. Edgerton, 438 F.3d 1043 (2006), all involved traffic stops that originated because of a law enforcement officer's inability to observe, from a distance, whether the vehicle in question was properly licensed. In McSwain, a Utah Highway Patrol trooper patrolling Interstate 70 observed that the defendant's vehicle did not have a rear or front license plate, and that the temporary registration sticker appeared to be covered with reflective tape. In Edgerton, a Kansas Highway Patrol trooper on nighttime patrol observed that the defendant's car "did not have a license plate in its rear brackets, but displayed a plate-sized temporary registration tag in the rear window," and he "could not read the state of origin or the numbers of the tag from a distance of four to five car lengths." 438 F.3d at 1045 (internal quotation marks omitted). And in Trestyn, a Wyoming Highway Patrol trooper was patrolling a section of Interstate 80 and observed a "minivan traveling eastbound displaying a rear California license plate but no front license plate." 646 F.3d at 736. Because the trooper "knew that California law require[d] vehicles to display both front and rear license plates," id., he stopped the minivan "for the sole purpose of determining whether the minivan violated Wyoming Statute section 31-2-201(d)(vi), which require[d] vehicles traveling in Wyoming but registered in another state to display either registration numbers or license plates in accordance with that state's laws," id. at 743.

We held, in each of these cases, that the singular purpose of the stop either was or should have been effectuated by the officer conducting a closer visual inspection of the

vehicle's license plate or temporary registration tag.  McSwain, 29 F.3d at 561 ("Once Trooper Avery approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied."); Edgerton, 438 F.3d at 1051 ("Once Trooper Dean was able to read the Colorado tag and deem it unremarkable, any suspicion that Defendant had violated [Kansas state law] dissipated"); Trestyn, 646 F.3d at 743 ("Once Trooper Nykun approached the minivan on foot, he reasonably could have observed the registration number on the minivan's license plate" and "should have known that [defendants] did not violate [Wyoming state law]").

These holdings make perfect sense: when reasonable suspicion for a traffic stop arises from a law enforcement officer's distant visual observations of a vehicle's license plate or registration tag, the simplest and best method to confirm or dispel the suspicion is to visually examine the license plate or registration tag at closer range.  In other words, a closer visual inspection of the license plate or temporary tag has the potential to "completely dispel[]" the officer's "reasonable suspicion regarding the validity of" the license plate or tag.  McSwain, 29 F.3d at 561.

Wiley never explains how, precisely, these holdings have relevance to the case at hand, and I submit they do not.  It is undisputed that Trooper Neff's reasonable suspicion in this case arose not from any difficulty he had in visually observing Wiley's vehicle or license plate, but rather from the results of two law enforcement computer database searches (one performed by Trooper Neff from his patrol car and the second performed by a dispatcher at Trooper Neff's request).  And, in turn, Trooper Neff's reasonable

6

suspicion was not limited to the possibility of a registration violation, but rather included the possibilities that Trooper Neff listed in his testimony: that Wiley was using the license plate of the former owner of the vehicle, that the vehicle driven by Wiley was stolen, or that Wiley had stolen valid registration tabs from someone else's license plate.

In short, I conclude that <u>Trestyn</u>, <u>McSwain</u>, and <u>Edgerton</u> are factually, as well as legally, distinguishable from the case at hand. Consequently, the principles outlined in these cases simply do not provide any useful guidance in the circumstances presented here, let alone justify a conclusion that Trooper Neff's reasonable suspicions could have been dissipated simply by examining the license plate of Wiley's truck.

> *C. Should Trooper Neff's suspicion of a registration violation have dissipated after Wiley provided him with the original motor vehicle title receipt?*

Judge Phillips would reverse the judgment of the district court on the basis of an issue never presented by Wiley to, nor resolved by, the district court: whether Trooper Neff's suspicion of a registration violation should have dissipated after Wiley, while sitting in Trooper Neff's patrol vehicle, provided Neff with the "original motor vehicle receipt" for Wiley's truck.[1] Judge Phillips justifies doing so because, in his view, the "approach" taken by "[t]he parties and the district court" below "failed to appreciate that the reasonable suspicion requirement continues throughout the *entire* stop." Phillips Concurrence at 8 (emphasis in original).

---

[1] I note here that Wiley did not have a vehicle registration form for the 2002 Toyota Tundra pickup truck he was driving and the GEICO EVIDENCE OF INSURANCE document he provided Trooper Neff was for a 1999 Honda Accord.

7

But Wiley has been represented by counsel throughout these proceedings, and his counsel presumably made a strategic decision to challenge the search of Wiley's vehicle and the seizure of the currency based upon the specific arguments that he made to the district court. In turn, the government's litigation strategy, including the precise questions it chose to pose to Trooper Neff during the suppression hearing, were presumably fashioned to respond to Wiley's arguments.[2] Because these strategic decisions effectively framed the record, the district court's decision, and the scope of this appeal, it is not our place to start from scratch, reexamine the case, and decide for ourselves what issues we believe are important and should have been raised.

In any event, even if we were free to inject new issues into the case at this late juncture, I would disagree with Judge Phillips that Trooper Neff's reasonable suspicion of a registration violation dissipated entirely at the point at which Wiley handed the "original motor vehicle receipt" to Trooper Neff. Viewing the evidence in the record in the light most favorable to the government, I note that Trooper Neff specifically expressed a concern that the vehicle driven by Wiley might have been stolen, and the provision by Wiley of the "original motor vehicle receipt" would not necessarily have

---

[2] Judge Phillips criticizes the government for failing to "me[e]t its burden to show that . . . reasonable suspicion [existed] from the beginning of the stop until the dog's sniff of the outside of Wiley's truck." Phillips Concurrence at 12. But I would suggest that, given the narrow scope of the issues raised by Wiley in his motion to suppress, the government was, appropriately enough, unaware that it was operating under any burden to explain precisely every step that Trooper Neff took during the course of the stop. Had Wiley argued the issue now raised by Judge Phillips, the government almost certainly would have broadened the scope of its direct examination of Trooper Neff during the suppression hearing.

resolved that concern. Indeed, Trooper Neff testified under cross-examination at the suppression hearing, when asked about the "original motor vehicle receipt," that he "needed to be able to verify the VIN numbers on the vehicle to make sure that this truck . . . matched to" the receipt. App. at 136. And, in fact, the record indicates that, near the end of the stop, Trooper Neff attempted to resolve his concerns regarding whether the vehicle was stolen by comparing the VIN numbers listed on the "original motor vehicle receipt" to the VIN numbers that were actually on Wiley's truck. In my view, it was not until after that time that Trooper Neff's reasonable suspicion regarding the rightful ownership of the vehicle was entirely dissipated.

> *D. Did Trooper Neff, at the conclusion of the traffic stop, have reasonable suspicion that Wiley was engaged in drug trafficking?*

Finally, Wiley argues that his case "is indistinguishable from" United States v. Wood, 106 F.3d 942 (10th Cir. 1997) because his "detention . . . after the completion of the traffic stop was not supported by objective facts amounting to reasonable suspicion of any crime, let alone the specific crime of drug trafficking." Aplt. Br. at 14. For the reasons that follow, I reject this argument.

"Absent valid consent, the scope or duration of an investigative detention may be expanded beyond its initial purpose only if the detaining officer at the time of the detention has a particularized and objective basis for suspecting the particular person stopped of criminal activity." Wood, 106 F.3d at 946. "[O]nce an officer returns the driver's license and vehicle registration" and advises the driver he or she is free to go, "he

9

must allow the driver to proceed without further detention or questioning unless the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity." United States v. Lyons, 510 F.3d 1225, 1237 (10th Cir. 2007). We look to the totality of the circumstances in evaluating whether the officer had an objectively reasonable basis to prolong the detention. Id. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Santos, 403 F.3d 1120, 1134 (10th Cir. 2005).

The government in this case points to several factors that it asserts "provided . . . [Trooper] Neff with reasonable suspicion of drug trafficking and justified prolonging the stop." Aplee. Br. at 22. I shall proceed to address these factors, first individually, and then collectively.

*1) Wiley's purported travel plans.*

"We have held that implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity." United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). In this case, Wiley did not offer any contradictory statements about his travel plans. Rather, he consistently told Trooper Neff that he was driving from his home in Missouri to southern California to visit an aunt and some friends. But Trooper Neff found two aspects of Wiley's story unusual, if not implausible. First, Trooper Neff thought it was unusual that Wiley had detoured from I-70 north to I-80 in Colorado in order to view the scenery in Wyoming on I-80. Second, Trooper Neff

10

thought it was implausible that Wiley was driving west out of Salt Lake City on I-80 to his purported destination in southern California. That is because I-80 runs through both northern Utah and northern Nevada and leads not to southern California but rather to San Francisco, California. And based on his training and experience, Trooper Neff was aware that I-80 is considered to be a major route for the cross-country transportation of drugs and large sums of money, and that northern California and the San Francisco Bay area are known sources of high-grade marijuana. Consequently, I conclude that we must consider Wiley's travel plans as a factor towards reasonable suspicion.

The government also notes that Trooper Neff testified at the suppression hearing that he was suspicious of Wiley's story that he was traveling to southern California in order to help out an elderly aunt. According to Trooper Neff, he had previously encountered people involved in criminal activity who had said they were traveling to visit a sick relative, and in Trooper Neff's view it is a "tactic . . . that they use . . . to persuade law enforcement as to, you know, I'm a good person; this is what I'm going to go do." App. at 90.

I am not persuaded, however, that we must defer to Trooper Neff's judgment on this particular factor. As we have noted, "[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." United States v. Simpson, 609 F.3d 1140, 1147 (10th Cir. 2010) (quotation marks omitted). Nothing about traveling to assist a relative is inherently implausible, nor does it lend itself in any way to a particular suspicion about criminal conduct. Consequently, I afford this fact no

11

weight in terms of assessing reasonable suspicion.

2) *Wiley's criminal history and Wiley's failure to admit that history.*

Criminal history, in conjunction with other factors, "contributes powerfully to the reasonable suspicion calculus." Id. (quotation marks and italics omitted). "Although a person with a criminal record could not be pulled over or detained based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior." Id.

In this case, Trooper Neff learned through dispatch that Wiley had a prior conviction for marijuana possession, as well as a paraphernalia-related conviction. Notably, that information contradicted Wiley's statement to Trooper Neff that he only had a prior DUI conviction. We have held that "lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion." Id. at 1149. Together then, these two factors, i.e., the fact that Wiley had a prior drug-related conviction and Wiley's apparent concealment of that conviction from Neff, "weigh[] heavily in favor of finding reasonable suspicion." Id. at 1147.

3) *The appearance and contents of Wiley's truck.*

The government points to what it believes are several incriminating aspects of the appearance and contents of Wiley's truck.

a) *Passenger window*

The government first notes that when Trooper Neff initially approached the passenger side of Wiley's truck, Wiley rolled the passenger side window down a mere

12

three or four inches. Trooper Neff testified at the suppression hearing that, based upon his experience, there could have been innocent reasons for this action, such as a broken window, or suspicious reasons, such as the driver wanting to hide the odor of something incriminating inside the vehicle, such as drugs. App. at 78. I conclude that this factor weighs somewhat in favor of reasonable suspicion, at least when it is considered in conjunction with the can of Febreze air spray that was found in the passenger compartment of the truck (a factor that is discussed in greater detail below). See United States v. Ludlow, 992 F.2d 260, 264 (10th Cir. 1993) (affirming district court's denial of motion to suppress, which was based in part on a finding that the driver "did not roll [his] window all the way down," thereby "rais[ing] the suspicion that there was an odor in the car that the driver did not want out").

*b) Presence of Febreze can*

When Trooper Neff opened the passenger side door of Wiley's truck to speak with Wiley (as a result of being unable to communicate with Wiley due to Wiley only rolling the passenger side window down 3 to 4 inches), he observed inside the passenger compartment of the truck a can of Febreze air spray. Trooper Neff testified that his law enforcement training taught him that drug traffickers frequently use odor-masking agents, such as Febreze, to attempt to conceal the odor of narcotics. And, Trooper Neff testified, consistent with that training, he frequently sees defendants in marijuana and methamphetamine cases using Febreze or air freshener sheets as odor-masking agents. As a result, Trooper Neff viewed the presence of the Febreze can in Wiley's truck as an

13

"indicator" of possible criminal conduct. App. at 56.

We have consistently acknowledged that the presence of an odor masking agent, such as Febreze, may give rise to reasonable suspicion on the part of law enforcement officials that the agent "is being used to mask the smell of drugs." United States v. Salzano, 158 F.3d 1107, 1114 (10th Cir. 1998); see United States v. West, 219 F.3d 1171, 1178-79 (10th Cir. 2000) ("The Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis."). Thus, I conclude that the presence of the Febreze can in this case must be weighed in favor of finding reasonable suspicion.

### c) Energy drink and coffee mug

Trooper Neff also observed on the front passenger seat of Wiley's truck a large container of energy drink mix and a coffee mug. Based upon his law enforcement training, Trooper Neff viewed these two items as indicators of possible criminal conduct. At the suppression hearing, Trooper Neff testified that both items indicated to him "that this driver wants to stay awake." App. at 85.

The problem, as Trooper Neff himself conceded at the suppression hearing, is that such items are commonly used by all drivers, not just individuals involved in criminal activity. And, indeed, in Simpson we "g[a]ve little weight" to the presence of "energy pills" in the defendant's vehicle because, we noted, it is "likely to find such items in the vehicle of any traveler." 609 F.3d at 1152. I therefore follow a similar path in this case and afford little or no weight to the presence of the energy drink mix and the coffee mug

14

in Wiley's truck.

*4) Wiley's recent truck purchase.*

The government notes that Trooper Neff, and in turn the district court, also relied on the fact that Trooper Neff believed that Wiley's truck was new and worth more than the price Wiley reported having paid.

During the suppression hearing, Trooper Neff testified that Wiley's truck appeared to him to be new. App. at 137. But Trooper Neff subsequently conceded, and a review of the video of the stop confirms, that Wiley correctly informed him that the truck was a 2002 model with nearly 68,000 miles on it. During the stop, Trooper Neff learned from Wiley's paperwork that Wiley had paid $5,000 for the truck. Tr. of Stop at 9 ("So you bought this for 5,000 bucks?"). Trooper Neff then asked Wiley, "Wow, where did you get that kind of deal?" Id. at 9-10. Wiley proceeded to explain that the market for such trucks had "collapsed" and that the owner, who was a neighbor, "needed to get rid of it." Id. at 10. When Trooper Neff asked "[H]ow much does this [truck] retail for?," Wiley responded, "You know, they're advertising them for, like, seven or eight [thousand], depending on where they're at. But they're not selling and everything's sitting." Id. At the suppression hearing, Trooper Neff testified that he did not believe that $5,000 was the true value of the truck. App. at 176. Trooper Neff further testified that, in his experience, drug trafficking organizations purchase vehicles at low cost for drug runners to use. Id. Consequently, Trooper Neff testified that this was a factor that supported his reasonable suspicion that Wiley was engaged in illegal activity. Id.

15

I conclude that this factor carries no weight. Although Trooper Neff expressed skepticism at the suppression hearing that $5,000 was the true value of the truck, the only relevant evidence in the record on the point is Wiley's statements to Trooper Neff that trucks of similar type and age were being advertised for sale for $7,000 to $8,000, but that no one was buying them at that price. Moreover, Trooper Neff did not dispute or reasonably question that Wiley actually purchased the truck from a neighbor who had experienced difficulty in selling the truck.

*5) Wiley's unemployment.*

According to the government, "Wiley's unemployment aroused Trooper Neff's suspicion in combination with the other factors because in his experience ninety-five percent of drug traffickers have no other employment." Aplee. Br. at 32. It is true that unemployment can weigh in favor of reasonable suspicion when it is considered in combination with other relevant factors. E.g., United States v. Alcaraz-Arellano, 441 F.3d 1252, 1260 (10th Cir. 2006) (noting defendant's unemployment made it unlikely that he made an innocent cross-country drive from New York to California, stayed for less than two days, and purchased a vehicle in California that he drove back to New York). The problem here, however, is that the government has not explained precisely what other factors we should consider in combination with Wiley's unemployment.[3] And the

_____

[3] The two factors that are arguably inconsistent with Wiley's unemployment were (1) his ability to afford a cross-country trip, and (2) his recent purchase of the truck. But Wiley explained to Trooper Neff that he was able to do both because he had saved money from when he was working, and because his parents were assisting him. On the other

(continued...)

16

government, understandably, makes no attempt to argue that unemployment, standing alone, gives rise to reasonable suspicion. Consequently, I afford Wiley's unemployment no weight.

*6) Wiley's nervousness.*

Finally, the government asserts that Wiley exhibited an unusual level of nervousness. "We have held consistently that nervousness is of limited significance in determining whether reasonable suspicion exists." Simpson, 609 F.3d at 1147 (internal quotation marks omitted). Two reasons justify this position. Id. "First, it is common for most citizens, whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer." Id. (internal quotation marks omitted). "Second, unless the police officer has had significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously." Id. at 1147-48. Only when a defendant exhibits "[e]xtreme and persistent nervousness" may this factor be "entitled to somewhat more weight." Id. at 1148 (internal quotation marks omitted).

It is true that the record on appeal suggests that Wiley was nervous throughout the traffic stop. Shortly after Wiley entered the patrol car, Trooper Neff asked Wiley if he was nervous and Wiley responded, "Just don't want any tickets." Tr. of Stop at 4.

---

[3](...continued)
hand, Wiley's unemployment obviously made it possible for him to take a cross-country trip of open-ended length, and it arguably explained his desire to drive as far as possible without stopping.

Trooper Neff testified at the suppression hearing that, later on during the stop, Wiley's hands were shaking as he looked through his cell phone for the phone numbers for his aunt and friend. App. at 177. Lastly, Trooper Neff testified that Wiley's nervousness continued even after Neff informed him that he would not be receiving a ticket. Id.

The problem, however, is that it is not clear from the record that Wiley's nervousness during the stop was "extreme." At worst, the record indicates that Wiley's hands were shaking while he looked through his cell phone for the numbers for his aunt and friend. Otherwise, the specific aspects of his nervousness are neither exhibited by the video of the stop (which does not show either Trooper Neff or Wiley while they were sitting in the patrol car) or by Trooper Neff's testimony at the suppression hearing. Consequently, I am unable to give this factor much, if any, weight.

*7) Conclusion*

Although it is a close case, I am persuaded that the totality of the circumstances outlined above, specifically Wiley's implausible or unusual travel route, Wiley's prior drug-related conviction and his failure to admit that history to Trooper Neff, the fact that Wiley only rolled down the passenger window three to four inches when first approached by Trooper Neff, and the presence of a can of Febreze air spray on the passenger seat, provided Trooper Neff with a reasonable and articulable suspicion that Wiley was engaged in drug-related activity, i.e., either possessing and transporting drugs or traveling to northern California to purchase and/or transport drugs back home. Consequently, I conclude that Trooper Neff's continued detention of Wiley was reasonable and did not

18

violate the Fourth Amendment.

## III

For these reasons, I would affirm the district court's order denying Wiley's motion to suppress evidence.