**F I L E D**

**UNITED STATES COURT OF APPEALS**

**June 9, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

vs.

GABRIEL ZEUS KAGURAS,

     Defendant - Appellant.

No. 05-8103
(D.C. No. 05-CR-75-B)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **McKAY**, and **O'BRIEN**, Circuit Judges.

Mr. Kaguras entered a conditional plea of guilty to possession with intent to distribute more than 40 but less than 60 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D). He retained the right to appeal the denial of his motion to suppress. Aplt. App. at 140, 149. The district court sentenced Mr. Kaguras to 27 months imprisonment, and three years supervised release. A panel of the court continued his release pending appeal. The issue on appeal is straightforward: whether, after having been issued a warning ticket, Mr.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Kaguras's continued detention was justified by reasonable suspicion. Mr. Kaguras refused to consent to further detention, so the officer required reasonable suspicion to detain him, subject him to further questioning, and conduct a canine sniff. Our jurisdiction arises under 28 U.S.C. § 1291. We hold that reasonable suspicion did not exist, and reverse and remand.

## Background

On January 19, 2005, Wyoming Highway Patrol Trooper Dwayne Hunt was parked in the median on Interstate 90 near milepost 144. Mr. Kaguras, traveling eastbound in a tan, Chevrolet Suburban, passed by. The trooper followed Mr. Kaguras, suspecting that the vehicle's registration was expired. After verifying that the vehicle was validly registered, the trooper passed Mr. Kaguras. Aplt. App. at 63. Near milepost 153, the trooper stopped to remove a piece of wood from the road. Mr. Kaguras changed lanes to avoid him, but did not signal when he returned to the right lane of travel. The trooper observed the failure to signal in violation of Wyo. Stat. Ann. § 31-5-217(a). At that point, the trooper stopped Mr. Kaguras. Aplt. App. at 64.

Mr. Kaguras provided his valid driver's license and explained that he had rented the Suburban in Seattle. Mr. Kaguras provided the trooper with the rental contract, which indicated that Mr. Kaguras was to return the car in Seattle on January 26, 2005. The trooper testified that he noticed that Mr. Kaguras left his

turn signal on when he pulled over, and that he appeared "pale" and "nervous." Aplt. App. at 65, 69. The trooper also testified that he smelled a "strong odor" of air freshener after he went up to the window and started speaking to Mr. Kaguras. The trooper also observed partially eaten food in the vehicle.

He informed Mr. Kaguras of the reason for the stop and inquired about his travel plans. Mr. Kaguras told the trooper that he was heading to Chicago from Seattle, where he rented the car. He said he was visiting his girlfriend for "as long as possible. As long as she puts up with [him]." Mr. Kaguras told the trooper he was going to be in Chicago for an indefinite amount of time, and that he had left Seattle two days prior. Aplt. Reply Br. Appx. A. The trooper observed two large plastic containers in the back of the suburban, as well as a large suitcase and red duffel bag. Aplt. App. at 66-69.

The trooper returned to his patrol car while Mr. Kaguras waited inside his vehicle. During this time, the trooper called in Mr. Kaguras's license information and then called a deputy who happened to be a drug detecting canine handler. Dispatch reported that Mr. Kaguras's license was valid. The trooper prepared a warning ticket and returned to speak to Mr. Kaguras.

The trooper gave Mr. Kaguras the warning and his driver's license, but retained the rental contract. He continued to question Mr. Kaguras about his travel plans. The trooper inquired how Mr. Kaguras was planning on getting the vehicle back to Seattle, and Mr. Kaguras explained that Hertz told him he could

- 3 -

"just do a one-way." Aplt. Reply Br. at 27. At that point, the trooper returned the rental contract to Mr. Kaguras.

The trooper asked Mr. Kaguras if he could ask a couple more questions. Mr. Kaguras said no, then asked if they were done. The trooper then said he would like to ask some more questions. Mr. Kaguras twice stated that he would like to get going. The trooper told Mr. Kaguras to hold on. At that point, the trooper asked the deputy, who had been waiting in his patrol car, to run the canine. The trooper informed Mr. Kaguras that they were going to run the canine, and he immediately requested a lawyer. The canine alerted, and officers found 110 pounds of marijuana in Mr. Kaguras's vehicle.

Mr. Kaguras moved to suppress the marijuana found in his car based on the unlawfulness of his detention and subsequent search. Aplt. App. at 9, 28. The district court denied the motion after an evidentiary hearing. In an oral ruling followed by written disposition, the district court concluded that (1) the trooper's initial stop was justified, and (2) based on the totality of the circumstances, the trooper had developed reasonable suspicion by the time he returned Mr. Kaguras's documents, thereby justifying continued detention. Id. at 122-125, 135-38. The district court relied on the following factors as giving rise to reasonable suspicion: (1) Mr. Kaguras's travel plans were inconsistent with the rental contract's requirement that the vehicle be returned to Seattle; (2) the strong scent of air freshener; (3) Mr. Kaguras was so nervous that his left leg shook; (4)

- 4 -

travel from a known drug source to a known drug destination; (5) Seattle's proximity to British Columbia; (6) partially eaten food in the car as evidenced by food wrappers; and (7) large luggage, "the very size of which would make an officer suspicious." Aplt. App. at 136; see also id. at 123-25. On appeal, the government does not rely on three of the seven factors, in particular (4), (5), and (6), commendably conceding that they are either weak and/or do not provide suspicion of criminal activity. Aplee. Br. at 8, n.4.

## Discussion

When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's findings of fact unless they are clearly erroneous. United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004). We review the ultimate issue of Fourth Amendment reasonableness de novo. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006); Rosborough, 366 F.3d at 1148. Mr. Kaguras bears the burden to prove the challenged search and seizure was illegitimate. Rosborough, 366 F.3d at 1148; United States v. Long, 176 F.3d 1304, 1307 (10th Cir. 1999).

The Fourth Amendment guarantees the right of the people to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV; see also Mapp v. Ohio, 367 U.S. 643, 655-56

(1961) (incorporating the Fourth Amendment's provisions to the states through the Fourteenth Amendment). A traffic stop is a seizure for the purposes of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Laughrin, 438 F.3d 1245, 1247 (10th Cir. 2006).

During a routine traffic stop, an officer may request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings. Rosborough, 366 F.3d at 1148 (citing United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994)). During the stop, an officer may routinely inquire about the driver's travel plans. United States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001); United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). The officer may even go further, inquiring into matters unrelated to the stop. Muehler v. Mena, 544 U.S. 93, 101 (2005). "Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." Id. (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991).

A traffic stop may not extend the stop beyond the time reasonably required to effectuate its purpose. Muehler, 544 U.S. at 101; Alcaraz-Arellano, 441 F.3d at 1258. Continued detention is appropriate only if during the initial traffic stop, the officer develops a reasonable suspicion of criminal activity, or the encounter becomes consensual. Rosborough, 366 F.3d at 1148; West, 219 F.3d at

1176. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005).

A traffic stop that is extended without consent, even for a relatively short duration, is unconstitutional absent a reasonable and articulable suspicion justifying the further detention. See United States v. Walker, 933 F.2d 812, 816 (10th Cir. 1991); United States v. Guzman, 864 F.2d 1512, 1519 n.8 (10th Cir. 1988), overruled on other grounds, United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995) (en banc). We have upheld the constitutionality of employing a canine to sniff for contraband when it is conducted *during* the lawful detention of a vehicle. United States v. Morales-Zamora, 914 F.2d 200, 203 (10th Cir. 1990). Even additional questioning that extends the time of detention requires adequate justification. See Alcarez-Arellano, 441 F.3d at 1258.

In order to assess whether reasonable suspicion existed, we look to the "totality of the circumstances" to see if the officer had a "particularized and objective basis for suspecting legal wrongdoing." See e.g., United States v. Bradford, 423 F.3d 1149, 1157 (10th Cir. 2005) (internal quotations omitted). Reasonable suspicion may exist even where each factor individually has an innocent explanation. United States v. Arvizu, 534 U.S. 266, 277 (2002); Cervine, 347 F.3d at 871, 872. But some seemingly innocuous factors can

- 7 -

describe such a large number of travelers, that practically random searches would be permitted if the courts deemed them sufficient to form the basis for reasonable suspicion. Reid v. Georgia, 448 U.S. 438, 441 (1980). Reasonable suspicion is a "fluid concept" that is context dependent. Ornelas v. United States, 517 U.S. 690, 696 (1996); Laughrin, 438 F.3d at 1247. We require the officer to "articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotations and citations omitted). There must exist some minimum level of objective justification. Id.

If the trooper in this case detained Mr. Kaguras after the purpose of the traffic stop was accomplished, with neither consent nor reasonable suspicion, then the fruits of that detention are inadmissible. See Wong Sun v. United States, 371 U.S. 471, 484 (1963). On appeal, Mr. Kaguras does not challenge the constitutionality of the initial traffic stop, and the government does not argue (nor could it on this record) that Mr. Kaguras consented to a lengthened detention. Thus, the appeal turns on whether the trooper had reasonable suspicion to detain Mr. Kaguras after he issued the warning.

The legitimate detention of Mr. Kaguras, based on the initial traffic violation, ended when the trooper issued the warning ticket. See Caballes, 543 U.S. at 407. The trooper continued to question Mr. Kaguras regarding his travel plans while retaining the car rental agreement; these inquiries were not consensual because Mr. Kaguras was not free to leave. For reasons that follow,

we conclude that the trooper lacked an objective basis for continuing to detain Mr. Kaguras after the time the trooper issued the warning ticket.[1] During the suppression hearing, the government suggested several factors as contributing to the trooper's reasonable suspicion: (1) nervousness, (2) partially eaten food and wrappers, (3) amount of luggage, (4) scent of air freshener, (5) additional keys on the key ring to the rental car, (6) Mr. Kaguras's plans to stay in Chicago indefinitely while the rental contract indicated the car was to be returned in Seattle, (7) travel from Seattle to Chicago, and (8) that Mr. Kaguras was driving a rental car. We have considered all the factors in this case in totality, but for ease of discussion address them one by one.

The government maintains that the strongest factor here is nervousness. Aplee. Br. at 14. As we have noted, "nervousness is a sufficiently common—indeed natural—reaction to confrontation with the police," and is of "limited significance" in our reasonable suspicion analysis. United States v. Santos, 403 F.3d 1120, 1127 (10th Cir. 2005). That certainly is true in this case.

---

[1]    In a letter submitted pursuant to Fed. R. App. P. 28(j), the government argues that Alcaraz stands "for the proposition that a traffic stop does not become unreasonable merely because the officer asks questions unrelated to initial [sic] reason for the stop, as long as those questions do not unreasonably extend the stop." Relevant here, however, is the Alcaraz court's analysis regarding the officer's questioning after he returned the driver's documentation. Alcaraz, 441 F.3d at 1259-60. The court there properly found that only consent or reasonable suspicion at that point justified further delay. Id. at 1259. Here the forty second interval between the issuance of the warning ticket and the return of the rental contract had to supported by either reasonable suspicion or consent because the purpose of the stop—the issuance of the warning—had been accomplished.

The trooper testified that he had attended classes showing him what to look for insofar as nervous behavior and inconsistent stories when it came to drug interdiction. Aplt. App. at 60. He suggested many, many factors during the suppression hearing that were indicative of nervousness. For example, he testified that one indicator of extreme nervousness was leaving one's turn signal on when stopped which occurred in this case (although it was later turned off). Id. at 66. Further, the trooper testified that Mr. Kaguras's hands were shaking when he handed him the rental contract, and that "one knee was really nervous, kind of jittery, but it seemed a nervous tick. Once somebody gets really nervous, you do something you don't really realize that you're doing." Id. at 72. The trooper also mentioned that Mr. Kaguras seemed to speak in a scratchy, high pitched, broken voice and that while Mr. Kaguras looked at him, Mr. Kaguras also looked away when the trooper spoke to him. Id. at 72-73. In the hearing and its written order, the district court focused on the shaking knee as confirmatory of extreme nervousness, concluding that it was unusual, something the court had not ever seen. Id. at 123, 135. Be that as it may, we doubt the officer is qualified to testify as to the etiology of Mr. Kaguras's "nervous tick."

The videotape and transcript indicate that Mr. Kaguras was responsive, and indeed, joked around with the trooper. He did not delay in responding to the trooper's questions, providing the requested documentation, and ultimately asserting his constitutional rights. His voice was consistent and direct

throughout. Moreover, the trooper's testimony that Mr. Kaguras was "pale" is without significance given that (1) the trooper had no basis of comparison, and (2) Mr. Kaguras was driving from Seattle, in January. We simply do not accord any nervousness on the part of Mr. Kaguras much weight in the analysis, particularly because so much of what contributed to the trooper's characterization simply does not differentiate this case from any other innocent motorist stopped by a state trooper.

The trooper also testified that Mr. Kaguras's failure to show sufficient relief after receiving a warning also was indicative of continued nervousness and reasonable suspicion. Id. at 83. The government presses a similar argument concerning reasonable suspicion. Aplee. Br. at 16. We do not decide this dubious proposition because when the trooper observed this lack of relief, the trooper had already issued the warning and was detaining Mr. Kaguras after he had fulfilled the "mission" of the original, justified stop. Observations made during an illegal detention cannot be used to bootstrap reasonable suspicion. As such, we decline to even consider Mr. Kaguras's "continued nervousness" in our analysis.

The record does not support the characterization that Mr. Kaguras's travel plans were vague, evasive, implausible or inconsistent. See e.g., Aplee Br. at 19; Aplt. App. at 123. Mr. Kaguras maintained throughout the entire traffic stop that he was going to Chicago to visit his girlfriend, and that the length of his stay

depended on how things in their relationship developed. Aplt. App. at 104 (Q: [to Trooper Hunt] He was very clear from [] start to finish, he was going to stay there as long as his girlfriend let him stay there? A: That's correct.). Although the rental agreement provided that the car was to be returned in Seattle seven days later, Mr. Kaguras informed the trooper that Hertz told him he could return the car in Chicago instead. Id. at 81.

This court has cautioned against "reading too much" into a car rental agreement. Santos, 403 F.3d at 1129 ("Common experience suggests that it is not unusual for a driver to rent a car for a certain period, and then to extend the rental without incurring a penalty or paying a higher rate. Such an arrangement may suggest that the driver's travel plans are uncertain or subject to change, but, without more, not that they are implausible."). Although the government properly notes, Aplee. Br. at 19, that unusual or implausible travel plans, or inconsistent answers about travel plans, can give rise to reasonable suspicion, Sokolow, 490 U.S. at 9, United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir. 1995), that simply was not the case here.

The government also argues that Mr. Kaguras "stuttered [] like he was trying to think of something to say" and repeated the questions the trooper asked him regarding the rental contract's return date. Aplt. App. at 81. We decline to consider this in our totality of the circumstances analysis because this conversation transpired after the Trooper had issued Mr. Kaguras the warning,

and therefore after the point at which he needed reasonable suspicion to continue to detain Mr. Kaguras.

Moreover, the amount and size of luggage in Mr. Kaguras's car was entirely consistent with his travel plans. The government's position that the "two large, plastic containers, the enormous, black suitcase and the large, red duffel bag were not consistent with an 'indefinite visit,'" Aplee. Br. at 18, is untenable. An indefinite visit could be for days or months or years and there was no basis for the trooper to regard the amount packed as suspicious, or for the government to categorize it as inconsistent.[2] The situation here is entirely different than those where "luggage" was properly considered as a factor giving rise to reasonable suspicion. See United States v. Sharpe, 470 U.S. 675, 687 (1985) (car appeared overloaded and the back of the car was weighed down); United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997) (no luggage either in trunk or back seat on a long distance trip could be suspicious). Nor can we endorse the district court's observation that large luggage inherently gives rise to suspicion because it might be used to carry marijuana which requires a lot of space. Aplt. App. at 124, 136.

The trooper further cited Mr. Kaguras's travel from "one known drug

---

[2] If Mr. Kaguras had packed very little, the argument might have been that such light travel was inconsistent with his hope to stay as long as his girlfriend let him. Reasonable suspicion must be reasonable. Although wholly innocent factors sometimes contribute to reasonable suspicion, the inferences to be drawn from those factors must be plausible, not conveniently tailored to trap a defendant. We are cautious about endorsing "catch-22" factors for reasonable suspicion.

source area to known drug source area destination" as a factor giving rise to reasonable suspicion. Id. at 105. The district court relied upon this and Seattle's proximity to British Columbia in its analysis. Id. at 124 ("Now, we've got to take into consideration that Seattle is very near the providence [sic] of British Columbia, where British Columbia marijuana is very desirable on the drug market. I would think that that would be quite important."), 135-136. In Santos, where travel between a drug source location (San Francisco) to a drug destination (New York City) was cited as a factor justifying reasonable suspicion, we cautioned: "If travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention. Our holding that *suspicious* travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se." Santos, 403 F.3d at 1132 (emphasis in original). The idea that the source city is in close proximity to another source city is even weaker. Indeed, the trooper admitted that "every place uses drugs" and that the "vast majority of places on the west coast" are sources of drugs. Travel between major cities is perhaps the weakest factor in the totality of circumstances analysis, and is entitled to practically no weight.

The mere fact that Mr. Kaguras's vehicle was rented, Aplt. App. at 79, is of no value in assessing whether the trooper had objectively reasonable suspicion of

criminal activity, and is not a factor on which reasonable suspicion can be legitimately predicated. Similarly, the trooper's testimony that he thought it was "odd," id. at 75, that Mr. Kaguras had extra keys affixed to the rental car key chain contributes nothing to the reasonable suspicion analysis. No evidence appears as to why extra keys attached to the key chain are indicative of criminal activity. The trooper's explanation is inadequate: "Most people I have stopped that drive rental cars don't have extra sets of keys on the key chain to the rental car. And me personally renting cars, I don't put my extra set of keys on there." Id.

Also unavailing is the trooper's observations of food wrappers in the car, and the district court's reliance thereon. Bradford, 423 F.3d at 1157 ("[F]ast food wrappers have become ubiquitous in modern interstate travel and do not serve to separate the suspicious from the innocent traveler.") (internal quotations and citations omitted). The suspicion associated with fast food wrappers is "virtually nonexistent." Wood, 106 F.3d at 947. The trooper testified that he thought the food wrappers were significant because he's "seen that people traveling across the country with illegal narcotics try to do so as quickly as they can and they generally just eat on the go." Aplt. App. at 90. Even with deference to his training and experience, the trooper conceded that Mr. Kaguras had left Washington two days prior, a reasonable amount of time to cover the distance in question, and that in light of that, the presence of food wrappers wasn't "worth

- 15 -

very much." Id. at 104.

The scent of air freshener, standing alone, is inadequate to support reasonable suspicion absent other indicia of criminal activity. United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir. 1997). The fact that a rental car had a strong odor of air freshener might reasonably cause an officer to be suspicious, but in this case, there is no actual indicia of criminal activity. We also note that the trooper did not testify as to any air fresheners in the car, and thus the scent could just as easily have been from cleaning the car prior to rental.[3]

As a whole, in totality, these factors do not give rise to objective, reasonable suspicion. Although we will consider factors that could have an innocent explanation, there must be something to indicate that criminal activity is afoot. While state troopers' training and experience are important, suspicions and hunches like those proffered here are insufficient as a matter of law. Wood, 106 F.3d at 946. The trooper did not have a proper basis for reasonable suspicion and his detention of Mr. Kaguras after he issued the warning was in violation of the Fourth Amendment. Accordingly, the district court should have granted the motion to suppress.

---

[3] The district court's belief that "when you've got that odor of air fresheners, you probably got a drug case" is not particularly helpful–suffice it to say, that conclusion is overbroad and each case must be decided on its own facts. Aplt. App. at 72.

REVERSED AND REMANDED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge