EBEL, J.,
concurring in the judgment.
This case turns on whether an officer conducting a traffic stop maintained a reasonable suspicion of criminal activity *813 throughout his investigation of a cooperative, yet objecting, citizen. Chief Judge Briscoe believes such justification existed throughout the stop and interrogation here, and she would therefore affirm the district court’s denial of Wiley’s suppression motion. Dissenting Op. at 830, 831-32, 834, 838-39.
While Judge Phillips and I agree that the prolonged detention violated Wiley’s Fourth Amendment rights, we disagree about when the encounter became unjustified and, thus, unconstitutional. Judge Phillips concludes that Trooper Neff lacked reasonable suspicion to continue to detain Wiley after Trooper Neff should have concluded that Wiley’s truck was lawfully registered in Missouri — something Judge Phillips believes should have happened well before Trooper Neff observed any of the factors that the government now contends authorized prolonging the detention for a dog sniff. Judge Phillips would thus reverse without needing to determine whether Trooper Neffs continued investigation gave him reasonable suspicion that Wiley was trafficking drugs. Phillips Op. at 822 n. 5. I believe, on the contrary, that Trooper Neff had sufficient cause to detain and question Wiley up to, but not after, the point he returned Wiley’s driving documents and told him that he could be on his way. In my opinion, therefore, only the evidence obtained against Wiley from that point on must be suppressed.
Thus, although Judge Phillips and I reach the same conclusion — that the evidence against Wiley must be suppressed— I write separately.
I.
I agree with Chief Judge Briscoe that Trooper Neff possessed reasonable suspicion to detain Wiley in his patrol car for sixteen minutes while he investigated a possible registration violation. We all agree that the “not on file” response to Trooper Neffs registration inquiry justified the initial traffic stop. See United States v. Esquivel-Rios, 725 F.3d 1231, 1235 (10th Cir.2013). The question, then, is whether the Fourth Amendment affords Trooper Neff the leeway to confirm or deny his registration suspicions as he did. I believe it does.
Although I doubt that a more vigilant inspection of Wiley’s license plate and apparently valid tags would have adequately dispelled a reasonable officer’s suspicions, because it seems unlikely that further roadside investigation was capable of reconciling the inconclusive information relayed by the computerized records search, we need not resolve that issue in this case because no such inspection occurred here, and the Fourth Amendment did not mandate such an inspection. Judge Phillips concludes otherwise, pointing to the statement in Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), that “the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time.” Phillips Op. at 825. As the Supreme Court has made clear, however, “[tjhat statement ... was directed at the length of the investigative stop, not at whether the police had a less intrusive means to verify their suspicions before stopping Royer. The reasonableness of the officer’s decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. ” United States v. Sokolow, 490 U.S. 1, 11, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (emphasis added) (“Such a rule would unduly hamper the police’s ability to make swift, on-the-spot decisions ... and it would require courts to indulge in unrealistic second-guessing.” (internal citations omitted)); see also Na *814 varette v. California, — U.S. -, 134 S.Ct. 1683, 1691, 188 L.Ed.2d 680 (2014) (reaffirming the same). I believe that rule adequately protects Trooper Neffs decision to question Wiley rather than to inspect closely his license plate. See United States v. Rodriguez, 739 F.3d 481, 489 (10th Cir.2013).[1]
In other words, once Trooper Neff received a “not on file” return from the computerized records search, it was reasonable for him to initiate a stop, approach Wiley, and investigate orally his suspicion that Wiley was violating Utah registration laws.[2] It was therefore reasonable for Trooper Neff to request Wiley’s driver’s license and registration, have dispatch run computer checks on those materials, and issue any citations or warnings as appropriate. See United States v. Kitchell, 653 F.3d 1206, 1217 (10th Cir.2011). While he waited for dispatch to run the requisite computer checks, moreover, it was likewise reasonable for Trooper Neff to inquire about Wiley’s travel plans, see United States v. Williams, 271 F.3d 1262, 1267 (10th Cir.2001), arrest record, see United States v. McRae, 81 F.3d 1528, 1536 n. 6 (10th Cir.1996), recent truck purchase, see United States v. Ludlow, 992 F.2d 260, 265 (10th Cir.1993), and almost anything else, “whether or not related to the purpose of [the] traffic stop,” so long as the questions “d[id] not excessively prolong the stop,” Kitchell, 653 F.3d at 1217. And it was perfectly reasonable for Trooper Neff to ask Wiley to sit in the front seat of his patrol car while he investigated all of the above. See United States v. Speal, 166 F.3d 350 (10th Cir.1998) (unpublished). Finally, and maybe most importantly, it was not unreasonable for Trooper Neff to detain Wiley for a mere sixteen minutes before he completed that registration investigation. See Williams, 271 F.3d at 1271.
In light of these well-settled rules, therefore, I do not believe Trooper Neffs registration investigation violated the Fourth Amendment.
II.
Although there was nothing unreasonable about the way Trooper Neff investigated the possible registration violation, that is not the end of the inquiry because, as even Trooper Neff conceded, it soon became clear that the suspicions justifying the stop had dissipated. See Aplt.App. at 135-36 (“I didn’t have a violation. I believed the vehicle belonged to him and he had the proper paperwork, and I’m not going to write a ticket for nothing.”). While that realization did not vitiate the lawfulness of the stop, it did require Trooper Neff to release Wiley at that time *815 unless he had acquired “a new and independent” basis for reasonably suspecting that Wiley was engaged in criminal activity. See United States v. Winder, 557 F.3d 1129, 1135 (10th Cir.2009); accord United States v. Soto-Cervantes, 138 F.3d 1319, 1322 (10th Cir.1998) (“Once the concern that justified the initial stop is dispelled, further detention will violate the Fourth Amendment unless the additional detention is supported by a reasonable suspicion of criminal activity.”). No one disagrees that Trooper Neff failed to release Wiley, or that Wiley refused to consent to his further detention. As such, the dispositive question is whether Trooper Neffs sixteen-minute registration investigation yielded the additional reasonable suspicion necessary to extend the traffic stop beyond its initial purpose.
The district court held that it did, concluding that the totality of the circumstances led Trooper Neff to reasonably suspect that Wiley was trafficking drugs. According to the district court, Wiley’s travel plans and the “lived-in” look of his truck combined with his past marijuana arrest, unemployment status, and nervousness supported an objectively reasonable suspicion to prolong the stop. Although Chief Judge Briscoe disclaims any reliance on many of the factors credited by the district court, she nevertheless concludes that the totality of the circumstances justified the prolonged detention and subsequent canine sniff. I cannot agree.
Before explaining why I diverge from Chief Judge Briscoe, I should stress that we agree that the district court erroneously credited many of the reasonable suspicion factors urged by the government. I agree with Chief Judge Briscoe, for example, that Wiley’s possessing a coffee cup and an energy drink contribute nothing to the reasonable suspicion calculus. To that list, I would also add Wiley’s hanging shirts, discarded wrappers, and cell phone charger. Although Trooper Neff testified that each of these factors heightened his suspicions, see, e.g., Dist. Ct. at 11 (“Trooper Neff testified that based on his training and experience, the motoring public traveling across the country in pursuit of innocent activities will periodically stop and tidy up their vehicle.”), the district court erred in holding that such factors could contribute to a reasonable suspicion of drug trafficking. This court has long recognized that inchoate suspicions and un-particularized hunches “based on indicators so innocent or susceptible to varying interpretation as to be innocuous cannot justify a prolonged traffic stop or vehicle search.” See, e.g., United States v. White, 584 F.3d 935, 950 (10th Cir.2009) (internal quotation marks omitted); accord United States v. Kaguras, 183 Fed.Appx. 783, 789 n. 2 (10th Cir.2006) (unpublished) (“Reasonable suspicion must be reasonable.”). The foregoing factors should have been afforded no weight, either individually or in the aggregate, not because they are associated with innocent but not criminal conduct, but because they have become so ubiquitous in interstate travel that they are simply not probative one way or another. No matter what other factors are present, in other words, I fail to see how the presence of, for example, a cell phone charger makes it more or less likely that an individual is trafficking drugs.
For similar reasons, I agree with Chief Judge Briscoe to afford no weight to Trooper Neffs testimony that his suspicions were also peaked by Wiley’s nervousness and recent truck purchase. According to Trooper Neff, the fact that Wiley said he paid $5,000 for his truck was suspicious because Trooper Neff believed it was “brand new” and worth much more than that, testifying that “drug organizations provide newly purchased vehicles for low prices and register those vehicles in the *816 name of the driver.” Dist. Ct. at 12. The problem, however, is that Wiley’s truck was neither brand new nor worth more than $5,000, and Trooper Neffs subjective beliefs to the contrary were not objectively reasonable in the face of being provided an official title receipt that listed the truck as six years old with more than sixty-seven thousand miles on it. And because reasonable suspicion cannot arise from an officer’s unreasonable factual errors, see United States v. Herrera, 444 F.3d 1238, 1246 (10th Cir.2006), the district court erred in weighing this factor in its totality of the circumstances analysis.
As Chief Judge Briscoe recognizes, the district court also erred in crediting Wiley’s alleged nervousness in the reasonable suspicion calculus. Although Trooper Neff asserted that Wiley appeared nervous, his subjective evaluation of Wiley’s behavior is not controlling: given the fact that the two had never interacted before, Trooper Neff lacked any basis to evaluate whether Wiley “was acting nervous and excited or whether he was merely acting in his normal manner,” United States v. Fernandez, 18 F.3d 874, 879 (10th Cir.1994) (internal quotation marks omitted). Indeed, because “it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously,” this court will reject an officer’s “naked assertion” of nervousness unless it is accompanied in the record by “specific indi-cia” verifying that “the defendant’s nervousness was extreme.” United States v. Simpson, 609 F.3d 1140, 1147-48 (10th Cir.2010) (emphasis added). That confirmation was not present here: neither Wiley’s statement that he did not want any tickets nor his alleged fumbling his phone as he searched for his aunt’s number qualifies as extreme nervousness. See United States v. Wood, 106 F.3d 942, 948 (10th Cir.1997) (“It is certainly not uncommon for most citizens — whether innocent or guilty — to exhibit signs of nervousness when confronted by a law enforcement officer.”); United States v. Wald, 216 F.3d 1222, 1227 (10th Cir.2000) (“Wald’s fumbling for his vehicle registration suggested nothing more than such innocuous nervousness.”).
Once the above factors are removed from the reasonable suspicion calculus— either because they find no support in the record or because they are too innocuous to be probative of anything — the only factors that remain are Wiley’s travel plans, arrest record, can of Febreze, and failure to roll down his window completely. For the reasons developed below, I believe that the totality of these factors, along with the inferences drawn therefrom, were insufficient to give an objective officer reasonable suspicion to suspect that Wiley was trafficking drugs.
i. Wiley’s partially rolled down window and can of Febreze
Trooper Neff testified that his suspicions were peaked upon approaching Wiley’s truck and noticing that Wiley had only partially rolled down his window. Combined with the fact that Wiley then rebuffed Trooper Neffs request to open Wiley’s truck door, Trooper Neff testified that he suspected Wiley was trying to mask the odor of illegal drugs. Wiley’s actions, however, amounted to little more than Wiley refusing to consent to a search of his vehicle, and it should go without saying that crediting such a refusal in the reasonable suspicion calculus would violate the Fourth Amendment. After all, as this court has previously recognized, “[i]f refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections. A motorist who consented to a search could be searched; and a motorist who refused consent could be searched, as well.” United States v. *817 Santos, 408 F.3d 1120, 1126 (10th Cir.2005). Thus, because a refusal of consent can play no role in the reasonable suspicion calculus, the district court erred in weighing Wiley’s partially rolled down window in its analysis.
Trooper Neff further testified, however, that his suspicion that Wiley was attempting to mask the smell of drugs was heightened upon noticing an aerosol can of Fe-breze in Wiley’s truck, which he asserted was “very common for being used to mask small amounts of marijuana.” Aplt.App. at 58. Although considering the Febreze can in the reasonable suspicion analysis is not per se inappropriate, it carries very little weight under the circumstances of this ease. As an initial matter, while it is true that “[t]he Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis,” United States v. West, 219 F.3d 1171, 1178 (10th Cir.2000) (emphasis added), there was no testimony here that scent of air freshener was emanating from Wiley’s truck, and I am unaware of any case where this court has held that the mere presence of an air freshener can support reasonable suspicion.[3] Nor would that seem to be a distinction without a difference: after all, if the inference is that drug traffickers use air fresheners to mask the smell of the drugs they are transporting, then the fact that an officer observes but does not detect the use of an air freshener would seem to counsel against inferring that drugs are present. Indeed, that would be particularly true in the case of an aerosol air freshener, like Febreze, which only works if activated by its user. In any event, however, even “[t]he scent of air freshener, standing alone, is inadequate to support reasonable suspicion absent other indicia of criminal activity,” Kaguras, 183 Fed.Appx. at 790, and the totality of the circumstances here make it particularly inappropriate to give this factor much weight. Not only are other indicia of criminal activity lacking, but having Fe-breze is entirely consistent with Wiley’s explanation that he was on a cross-country road trip, especially because, as Trooper Neff testified, Wiley’s truck had a “lived-in look” with luggage and wrappers strewn throughout the cabin.
ii. Wiley’s travel plans
Trooper Neff also testified that his suspicions were heightened upon learning of Wiley’s travel plans. Although this court has “credited inconsistent travel plans as a factor contributing to reasonable suspicion when there are lies or inconsistencies in the detainee’s description of them,” we have rightfully “been reluctant to deem travel plans implausible — and hence a factor supporting reasonable suspicion— where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make.” Simpson, 609 F.3d at 1148-49. Because Wiley’s travel plans were neither inconsistent nor implausible and, therefore, not suspicious as a matter of law, the *818 district court erred in finding Wiley’s travel plans supportive of reasonable suspicion. See Santos, 403 F.3d at 1132 (“Our holding that suspicious travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se.”).
Whey told Trooper Neff that he was driving from Missouri to California to visit friends and family. When pressed for more details, he said he was going to Los Angeles to visit both his friend, Zach, who recently opened a cross-fit gym, and his aunt, Shiloh, who needed help around her house because she was ninety-two years old. Wiley relayed that it was as good a time as any to make the cross-country trip because he had recently been laid off from his job at a bank. When Trooper Neff inquired whether Wiley had taken 1-80 all the way from Missouri — presumably attempting to trip Wiley up because 180 does not travel through Missouri — Wiley responded that he had taken 1-70 through Colorado but had elected to take 1-80 the rest of the way to California on his dad’s recommendation that “it was beautiful country.” Tr. of Stop at 7. Although he conceded that taking 1-70 would have saved him almost a day in travel, he noted both that the northern route was more scenic and that he had never taken it before, proclaiming “[i]f you’re driving this [far], man, it might as well be worth it.” Tr. of Stop at 13.
As Chief Judge Briscoe recognizes, Wiley’s account of his travel plans was neither vague nor inconsistent. Without hesitation, he was able to explain where he was coming from, where he was going, and why he was going there; he was able to provide Trooper Neff with the names and numbers of his aunt and friend who he was going to visit,[4] and his recollection of the places that he had stayed and the roads that he had traveled on up to that point were consistent with those plans. Trooper Neff testified that he found it suspicious that Wiley was on 1-80 rather than 1-70, because 1-70 provided a more direct route to his destination; but Wiley’s driving on 1-80 was actually consistent, not inconsistent, with his claim that he desired to take what he believed was a more scenic route to his destination. Moreover, while taking a less-direct, more-scenic route could be inconsistent with a detainee’s claim that he was in a hurry or needed to be somewhere, Wiley’s travel plans were entirely consistent with his unemployment, which “permitted him the luxury of time to make such a trip,” Wood, 106 F.3d at 947. His account of his travel plans also cohered with the contents of his truck, as snacks, caffeine, and cell phone chargers are part and parcel of any cross-country road trip.
Since there was nothing suspicious about Wiley’s account of his travel plans, reasonable suspicion would have been warranted only if the plans themselves were implausible or suspicious — that is, if Wiley’s itinerary was not “merely unusual,” but was “sufficiently bizarre” to constitute a factor contributing to reasonable suspicion, see Simpson, 609 F.3d at 1151. While it seems unlikely that Wiley’s itinerary was even unusual, his travel plans were decidedly not sufficiently bizarre or implausible to warrant reasonable suspicion. See Wood, 106 F.3d at 947 (“There is nothing criminal about traveling by car to view scenery.”). To be sure, Trooper Neff believed that they were — asserting that 1-80 is not beautiful, and even if it were, driving *819 on 1-80 for its scenery alone is suspicious — but implausibility, like all reasonable suspicion factors, must be judged under an objective standard, not according to whether the individual officer would choose to take the same trip or route if given the chance. And under the totality of the circumstances presented here, there was nothing objectively implausible about Wiley’s travel itinerary. Visiting friends and family was reason enough to take the trip; his savings and family assistance made it financially attainable; and his recently being laid off allowed him the flexibility to take the route of his choosing.
iii. Wiley’s arrest record
Trooper Neff also testified that his suspicions of drug trafficking activity were heightened after a criminal history check revealed that Wiley had previously been arrested for marijuana and paraphernalia possession. Although this court has long stated that an individual’s criminal record “may cast a suspicious light on other seemingly innocent behavior,” see Simpson, 609 F.3d at 1147, we have stressed that “prior criminal involvement alone is insufficient to give rise to the necessary reasonable suspicion to justify shifting the focus of an investigative detention from a traffic stop to a narcotics or weapons investigation.” Wood, 106 F.3d at 948. “If the law were otherwise, any person with any sort of criminal record — or even worse, a person with arrests but no convictions — could be subjected to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification at all.” United States v. Sandoval, 29 F.3d 537, 543 (10th Cir.1994). In short, lest we desire to turn individuals with pri- or arrests, let alone convictions, into “roving targets for warrantless searches,” Santos, 403 F.3d at 1132, we give little weight in the reasonable suspicion calculus to criminal history when, as here, other indi-cia of criminal activity are lacking. What’s more, there is also some question whether the criminal history check in this case actually revealed facts that mapped onto the officer’s ultimate suspicions: although Trooper Neff testified that he suspected Wiley of drug trafficking, Wiley’s criminal history report only revealed arrests — not convictions — for marijuana and paraphernalia possession — not trafficking — dating back more than seven years.[5] Needless to *820 say, the probative value of a past conviction — to say nothing of a mere arrest— becomes weaker when the record moves from revealing a past propensity to commit the exact offense suspected, to revealing simply that the detainee has broken the law in the past.
For these reasons, then, Wiley’s criminal history could have reasonably contributed very little to Trooper Neffs suspicions of drug trafficking.
In the whole picture of the stop, the negligibly suspicious factors observed by Trooper Neff become even less suspicious: Trooper Neff saw a Febreze can and found an old arrest, but he also, for example, detected no extreme or prolonged nervousness; heard no inconsistent or implausible travel plans; observed no disconnect between those plans and the contents of Wiley’s truck; identified no alterations or modifications to the body of the truck; and neither saw nor smelled any drugs — all indicators which this court has been repeatedly told correlate strongly with drug trafficking. I do not mean to suggest that reasonable suspicion cannot be found without observing all, or for that matter any, of these factors, but just that their absence cannot be overlooked during our totality of the circumstances analysis. If the presence of individually innocent factors cannot be omitted from the reasonable suspicion calculus, then the lack of especially incriminating factors should not be excluded either. Cf. United States v. Lopez, 518 F.3d 790, 798 (10th Cir.2008) (“[W]e believe that omission of an expected or customary action, equal to actions themselves, can be of use in assessing whether something is amiss and criminal activity may be afoot.”). In the end, then, only one conclusion follows from the totality of the circumstances presented here: Trooper Neff may have guessed right this time, but that’s not the stuff reasonable suspicion is made of.
I respectfully concur in reversing the district court’s denial of Wiley’s Motion to Suppress. I would reverse and remand for further proceedings consistent with this opinion.

. I agree with Chief Judge Briscoe’s distinction of United States v. McSwain, 29 F.3d 558 (10th Cir.1994) and its progeny. See Dissenting Op. at 831-33. At the risk of oversimplifying, our "tag cases” are essentially mistake of fact cases that stand for the following proposition: when an officer initiates a traffic stop based on a faulty, visual observation, he cannot detain the individual past the point he realizes, or should have realized, that the justification for the stop was illusory from the beginning. That principle does not control here, where the stop was based not on a faulty observation but on an objective incongruity between the computerized records search's "not on file” return and Wiley’s apparently valid plate.

. Other officers have testified that such an investigation is essentially standard operating procedure. See United States v. Hernandez-Velasco, 2006 WL 2129468, at n. 7 (D.Utah July 28, 2006) ("Trooper Carrubba testified that in his experience, if he received a 'not on file’ response to a computer inquiry he would always stop the vehicle to clarify any discrepancies between the computer and the paperwork within the vehicle.”); United States v. Lee-Speight, 2010 WL 2653412, at *1 (D.Kan. June 29, 2010) (same).

. See, e.g., United States v. Beltran-Diaz, 366 Fed.Appx. 950, 953 (10th Cir.2010) (unpublished) (considering "heavy scent of air freshener”); United States v. Bravo, 306 Fed.Appx. 436, 439 (10th Cir.2009) (unpublished) (same); United States v. Powell, 277 Fed.Appx. 782, 785 (10th Cir.2008) (unpublished) (same); United States v. Lyons, 510 F.3d 1225, 1231 (10th Cir.2007) (same); United States v. Kaguras, 183 Fed.Appx. 783, 790 (10th Cir.2006) (unpublished) (same); United States v. Garcia-Rodriguez, 127 Fed.Appx. 440, 446 (10th Cir.2005) (unpublished) (same); United States v. Anderson, 114 F.3d 1059, 1066 (10th Cir.1997) (same); United States v. Leos-Quijada, 107 F.3d 786, 795 (10th Cir.1997) (same); United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir.1995) (same).

. Although neither Zach nor Shiloh answered when dispatch attempted to make contact, that did not provide reasonable cause to be suspicious: there was no reason to believe the numbers were not valid, and in the days of mass-telemarketing and caller ID, many of us screen unknown calls, especially those from out of state numbers.

. Perhaps recognizing the disconnect between a nearly decade old marijuana possession charge and full-scale drug trafficking, the government attempts to imbue this factor with more probative force by alleging that Wiley lied about his marijuana charges. Aple B. at 26. But the record does not support that allegation.
When Trooper Neff asked Wiley if he had ever been arrested before, Wiley responded, "A long time ago I had a DUI, seven years ago. And it was just kind of — ." Tr. of Stop at 9. Before he could finish his thought, dispatch interrupted and asked Trooper Neff a question about Wiley's truck, and Trooper Neff responded. Id. After responding to dispatch, Trooper Neff, as he had done many times throughout the interrogation, immediately changed the subject and asked Wiley, "So you bought this truck for 5,000 bucks?” Id. Wiley's arrest record was not discussed again until four minutes later when dispatch informed Trooper Neff that "there was a prior arrest in 2001 for marijuana possession and paraphernalia possession.” Id. at 14. Trooper Neff said, “tell me about that,” and Wiley responded, "They didn’t come out that way because of the probation. I had two years’ probation only, and so they erased it. The only thing that should have stuck was the DUI and the paraphernalia.” Id. Wiley's arrest record was never discussed further.
Because the record makes clear that Wiley was cutoff while attempting to explain the circumstances surrounding his DUI arrest— which included the fact that he was also found in possession of marijuana and paraphernalia at that time — I am unable to conclude that Wiley lied about his criminal history. After all, it was Trooper Neff who changed the subject away from Wiley’s criminal history, and Wiley was under no duty to *820 protest that interruption or to return the interrogation to the subject at a later time. Cf. Kaguras, 183 Fed.Appx. 783 at n. 2 ("We are cautious about endorsing 'catch-22' factors for reasonable suspicion.”).